Filed 12/29/15; pub. order 1/28/16 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| EPIC MEDICAL MANAGEMENT, LLC, | B261541 |
| Plaintiff and Respondent,<br>v. | (Los Angeles County<br>Super. Ct. No. SC120141) |
| JUSTIN DOMINIC PAQUETTE, M.D., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Lisa Hart Cole, Judge.  Affirmed.

Walton & Walton, Lewis R. Walton, L. Richard Walton and Harold A. McDougall for Defendant and Appellant.

Tesser Ruttenberg & Grossman and Kenneth G. Ruttenberg; Law Offices of Lara M. Krieger and Lara M. Krieger for Plaintiff and Respondent.

_____

This case involves a dispute between a doctor, appellant Justin Paquette, M.D., and a medical management company, Epic Medical Management, LLC, with which he had contracted to supply non-medical management services to his practice. The doctor and the management company had a falling out and agreed to terminate their contract. The management company believed it was due additional fees under the agreement; the doctor believed the management company had under-performed its duties under the contract and owed him money. The matter proceeded to arbitration, and the arbitrator ruled in favor of the management company. On cross-petitions to confirm and vacate the award, the trial court ruled in favor of the management company and confirmed the award. The doctor appeals, arguing that the arbitration award cannot stand because the contract, as interpreted by the arbitrator, is illegal. We conclude that the issue is not reviewable, and, if it were, the contract is not illegal as a matter of law. We therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 1, 2008, the doctor and the management company entered into a "Management Services Agreement." Pursuant to the agreement, the doctor engaged the management company "to provide management services as are reasonably necessary and appropriate for the management of the non-medical aspects of [the doctor's] medical practice." Among other things, the management company was required to lease office space to the doctor, lease to him all equipment he deemed reasonably necessary and appropriate, provide support services, provide non-physician personnel, establish and implement a marketing plan, conduct billing and collections, and perform accounting services. The doctor was responsible for providing medical services.[1]

As to compensation, the contract stated the parties agreed that "it will be impracticable to ascertain and segregate all of the exact costs and expenses that will be

---

[1]  The management company was required to provide non-physician personnel, including nursing staff, but the physician was responsible for training and supervising the nurses.

incurred by [the management company] in performance of the [m]anagement [s]ervices. However, it is the intent of the parties that the compensation paid to [the management company] provides a reasonable return, considering the investment and risk taken by [the management company] and the value of the [p]remises, [l]eased [e]quipment and other [m]anagement [s]ervices provided by [the management company] hereunder." The agreement then provided, "For each month that [the management company] provides the [m]anagement [s]ervices . . . , [the doctor] shall pay to [the management company] a management fee equal to one hundred twenty percent (120%) of the aggregate costs [the management company] incurs in providing the [m]anagement [s]ervices . . . in that month but not to exceed fifty percent (50%) of the Collected Professional Revenues plus twenty five percent (25%) of the Collected Surgical Revenues . . . ." A subsequent provision defined "Collected Revenues" to mean the total received by the practice, less any refunds paid and bad-debt write-offs.

The contract also included an arbitration clause and a prevailing party attorney's fee clause.

The parties performed under the agreement for 3½ years until the doctor terminated it at the end of March 2012. However, the management company never charged, and the doctor never paid, a fee based on 120 percent of the management company's costs. Instead, the management company charged, and the doctor paid, a fee calculated as 50 percent of office medical services, 25 percent of surgical services, and 75 percent of pharmaceutical expenses. (We call this the "50-25-75" method.)[2]

As any patient knows, delays occur between the time a physician performs services for a patient and the time the physician receives payment for those services from the patient's insurance company. The main issue of dispute, from the management

---

**2**    The management company was in charge of the doctor's billing, collections, and bank account. Thus, it may be more correct to say that the management company *paid itself* these amounts. The doctor argued before the arbitrator that he was not made aware that the management company was paying itself according to the 50-25-75 method. The arbitrator concluded that the doctor was, in fact, provided documentation of the practice.

3

company's point of view, was whether it was entitled to its share, under the 50-25-75 system, of the revenues collected *after* the agreement was terminated, traceable to services provided by the doctor to his patients *before* termination.[3]  The main issue, from the doctor's point of view, was whether the management company breached its obligations under the agreement.

Cross-complaints were filed.  Pursuant to the arbitration clause in the agreement, the parties agreed to stay the pending action and resolve their claims by arbitration.

The matter proceeded to arbitration.  After a hearing, the arbitrator issued a written award, concluding that the management company did not materially breach the agreement, but the doctor did.  As to the management fees, the arbitrator found that, by the parties' practice, they had modified the agreement so that the management company was entitled to fees on a 50-25-75 basis.  The arbitrator also concluded that the doctor had a continuing obligation to pay management fees accrued during the term of the agreement.  At the arbitration hearing, the doctor had argued that because some of the fees were paid for the management company's *marketing* services, the payments constituted an illegal kickback scheme for referred patients.  There is no dispute that some physician members of the management company did, in fact, refer patients to the doctor.  The doctor took the position that paying the management company a percentage of the revenues generated by those patients constituted illegal kickbacks, barred by Business and Professions Code section 650 (section 650).[4]  The arbitrator did not entirely

---

[3]     The agreement provided that, upon termination of the agreement, neither party would have any further obligations except for "(i) obligations accruing prior to the date of termination, and (ii) obligations, promises, or covenants set forth herein . . . that are expressly made to extend beyond the term of this Agreement, including, without limitation, . . . fees . . . ."

[4]     The first two subdivisions of section 650 provide:  "(a) Except as [otherwise provided], the offer, delivery, receipt, or acceptance by any person licensed under this division . . . of any rebate, refund, commission, preference, patronage dividend, discount, or other consideration, whether in the form of money or otherwise, as compensation or inducement for referring patients, clients, or customers to any person, irrespective of any

disagree with this characterization, but concluded that any such violation was "technical" and did not impact the award.

The arbitrator awarded the management company a total of $286,776.95 in unpaid management fees. Pre-award interest, costs, and prevailing party attorney's fees were also awarded.

The management company petitioned to confirm the award; the doctor moved to vacate it. The doctor's purported grounds for vacation, also pursued on appeal, were that: (1) the arbitrator exceeded her powers by creating a new agreement between the parties; (2) the agreement created by the arbitrator violated the statutory prohibition on the payment of referral fees and the law against the corporate practice of medicine; and (3) the arbitrator prejudicially erred by not allowing the doctor sufficient time to testify.

The doctor supported his request to vacate with a declaration of his counsel, setting forth counsel's recollection of the arbitration; some of the exhibits submitted to the arbitrator; and a declaration of his expert witness, Carol Lucas. Lucas had testified at the arbitration, to show that the management company improperly engaged in the practice of medicine due to its referrals of patients to the doctor. Her declaration in support of the request to vacate set forth her understanding of section 650; her belief that the original compensation provision of the management agreement had been carefully drafted to avoid any conflict with the statute; and her opinion that altering the provision to the 50-25-75 method of calculating fees (particularly when the management company did, in fact, refer patients to the doctor) raised significant issues of legality under the statute and the ban on the corporate practice of medicine.

---

membership, proprietary interest, or co-ownership in or with any person to whom these patients, clients, or customers are referred is unlawful. [¶] (b) The payment or receipt of consideration for services other than the referral of patients which is based on a percentage of gross revenue or similar type of contractual arrangement shall not be unlawful if the consideration is commensurate with the value of the services furnished or with the fair rental value of any premises or equipment leased or provided by the recipient to the payer."

After briefing and a hearing, the trial court denied the request to vacate and granted the management company's petition to confirm the award. The court concluded: (1) the arbitrator did not exceed her powers by reasonably interpreting the contract; (2) any illegality was technical only and did not constitute a sufficient basis to vacate the award; and (3) the doctor failed to establish that he was prejudiced by any limitation on his testimony.

The court entered judgment confirming the award. The doctor filed a timely notice of appeal.

### DISCUSSION

The doctor pursues the same three arguments on appeal: (1) the arbitrator exceeded her powers by remaking the agreement; (2) the arbitrator's modification of the agreement resulted in an illegal agreement (both for referral kickbacks and the corporate practice of medicine); and (3) the arbitrator prejudicially limited his ability to testify. "In general, judicial review of an arbitration award is extremely limited. As the California Supreme Court explained in *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 6, [] (*Moncharsh*), 'an arbitrator's decision is not generally reviewable for errors of fact or law, whether or not such error appears on the face of the award and causes substantial injustice to the parties.' " (*SingerLewak LLP v. Gantman* (2015) 241 Cal.App.4th 610, 674-675 (*SingerLewak*).)

A.    *The Arbitrator Did Not Exceed Her Powers By Finding the Parties Had Modified The Agreement*

A court may vacate an arbitration award if "[t]he arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted." (Code Civ. Proc., § 1286.2, subd. (a)(4).) " 'Arbitrators are not obliged to read contracts literally, and an award may not be vacated merely because the court is unable to find the relief granted was authorized by a specific term of the contract. [Citation.] The remedy awarded, however, must bear some rational relationship to the

6

contract and the breach. The required link may be to the contractual terms as actually interpreted by the arbitrator (if the arbitrator has made that interpretation known), to an interpretation implied in the award itself, or to a plausible theory of the contract's general subject matter, framework or intent. [Citation.] The award must be related in a rational manner to the breach (as expressly or impliedly found by the arbitrator).' [Citation.]" (*Bonshire v. Thompson* (1997) 52 Cal.App.4th 803, 809 (*Bonshire*).)

The doctor argues that the *arbitrator* modified the agreement to provide that the management company's fee would be calculated by the 50-25-75 method. That is not so – the arbitrator did not modify the agreement; she concluded that, by their practice, the parties had done so. This was well within the arbitrator's powers.

It is true that the parties may, by "an express and unambiguous limitation in the contract or the submission to arbitration," limit the arbitrator's authority to find the facts, interpret the contract, and award any relief rationally related to his or her findings and contractual interpretation. (*Gueyffier v. Ann Summers, Ltd.* (2008) 43 Cal.4th 1179, 1182.) There is no such provision here. The doctor relies on language of the management contract providing that all modifications must be in writing and an integration clause providing that no other understandings between the parties will be binding unless signed and attached to the agreement.[5] But these terms are simply parts of the contract which the arbitrator was required to interpret; they were not express and unambiguous limitations on the arbitrator's authority. In fact, they were not limitations on the arbitrator's authority at all. (Compare *Bonshire, supra,* 52 Cal.App.4th at p. 806 [agreement provided that no extrinsic evidence " 'may be introduced in any judicial or arbitration proceeding' "].) The arbitrator's powers were not expressly limited by any

---

[5]   As a general rule, if a contract provides that a writing is necessary to amend it, the parties may, by their conduct, waive such a provision. (*Biren v. Equality Emergency Medical Group, Inc.*(2002) 102 Cal.App.4th 125, 141.) The arbitrator concluded that this happened in this case.

term in the contract. She was therefore permitted to find that the parties had by practice modified their agreement, and was authorized to render an award on that basis.

B.     *The Award May Not Be Vacated For Illegality*

While an arbitrator's award is generally not reviewable for errors of fact or law (*Moncharsh, supra,* 3 Cal.4th at p. 11), it can be reviewed for illegality in certain circumstances. When it is alleged that the contract *in its entirety* is illegal, the issue is reviewable. (*Loving & Evans v. Blick* (1949) 33 Cal.2d 603, 609; *Lindenstadt v. Staff Builders, Inc.* (1997) 55 Cal.App.4th 882, 892.) But if the alleged illegality goes only to a portion of the contract, the entire controversy, including the issue of illegality, is deferred to the arbitrator. (*Moncharsh,* at p. 30.) There are "some limited and exceptional circumstances justifying judicial review of an arbitrator's decision when a party claims illegality affects only a portion of the underlying contract. Such cases would include those in which granting finality to an arbitrator's decision would be inconsistent with the protection of a party's statutory rights. [Citation.] [¶] Without an explicit legislative expression of public policy, however, courts should be reluctant to invalidate an arbitrator's award on this ground. The reason is clear: the Legislature has already expressed its strong support for private arbitration and the finality of arbitral awards in title 9 of the Code of Civil Procedure. [Citation.] Absent a clear expression of illegality or public policy undermining this strong presumption in favor of private arbitration, an arbitral award should ordinarily stand immune from judicial scrutiny." (*Id.,* at p. 32.)

1.     *The Award Is Not Reviewable For Illegality In the Entirety*

To the extent the doctor argues that the entire contract, as interpreted by the arbitrator, is illegal, we disagree. Even assuming, for the moment, that the doctor is correct and that payment to the management company according to the 50-25-75 method constitutes kickbacks for referrals, this does not go to the entirety of the contract. Referral patients were a small percentage of the patients seen while the doctor and management company were operating pursuant to the agreement. The agreement was not

8

a referral agreement, but one for management services, of which referrals played only an incidental part.

The same conclusion applies to the doctor's argument that the agreement as modified provides for the corporate practice of medicine; the doctor does not argue that he and the management company were engaging in any such illegality during the years the management company was providing services and being paid according to the 50-25-75 system; he argues the illegality arose only when the management company sought payment *after* its services had ended. As the purported illegality does not go the entire contract, the arbitrator's decision is not reviewable on this basis.

2. *The Award Is Not Reviewable Under The Statutory Public Policy Exception*

The doctor next argues that the award falls within the "limited and exceptional circumstances" in which granting finality to the decision would be inconsistent with the protection of a party's statutory rights or public policy. We have recently discussed the method by which courts should approach a challenge to an arbitration award on this basis. (*SingerLewak, supra*, 241 Cal.App.4th at p. 680.) The court should first determine whether the award is reviewable before turning to the issue of whether it should be upheld. (*Ibid.*) In determining whether an award is reviewable, the threshold question is whether according finality to the award would be inconsistent with protecting the party's statutory rights. In other words, would the award contravene an explicit legislative expression of public policy that undermines the strong presumption in favor of private arbitration? (*Id*. at p. 680.) The question is *not* whether the arbitrator's award violates the statutory right identified by the complaining party, but whether *if it did*, the award contravened an explicit legislative expression of public policy that undermined the presumption in favor of arbitration. (*Id*. at p. 681 & fn. 4.)

We turn to the statutory provisions allegedly violated by the award. Preliminarily, the doctor relies on a single provision – section 650. He identifies no separate statutory provision purportedly violated by the corporate practice of medicine.

9

We repeat the key provisions of section 650. Subdivision (a) provides, in general, that payment or receipt of any consideration by a physician for referring patients is unlawful. While the doctor argues that this is an absolute expression of public policy against the payment of any consideration to someone making a referral, subdivision (b) undermines that characterization. That subdivision provides, "The payment or receipt of consideration for services other than the referral of patients which is based on a percentage of gross revenue or similar type of contractual arrangement shall not be unlawful if the consideration is commensurate with the value of the services furnished or with the fair rental value of any premises or equipment leased or provided by the recipient to the payer." In other words, subdivision (b) permits *precisely* the arrangement contemplated by the modified agreement – payment to a management company for management services based on a percentage of revenue – as long as the consideration is commensurate with the value of the services furnished (and facilities and equipment leased). Given this flexibility in section 650, there is no absolute prohibition on consideration being paid a management company – even one which occasionally refers patients. With respect to this statutory provision, the arbitrator's enforcement of the modified agreement (even if an erroneous interpretation of law) does not contravene an explicit legislative expression of public policy that undermines the presumption in favor of private arbitration.

3. *There Is No Legal Violation As A Matter of Law*

Even if we were to conclude the issue was reviewable, we would conclude there is no violation of law. A trial court reviews an arbitrator's determination of illegality de novo. (*Ahdout v. Hekmatjah* (2013) 213 Cal.App.4th 21, 34-35.) We in turn review the trial court's decision de novo. To the extent the trial court's ruling rests on a determination of disputed factual issues, we apply the substantial evidence test. (*Lindenstadt v. Staff Builders, Inc., supra,* 55 Cal.App.4th at p. 892, fn. 7.)

A brief history of the development of the law in this area demonstrates that the contract between the doctor and the management company is not illegal.

10

Section 650 was first enacted in 1949. (Stats. 1949, ch. 899, § 1, p. 1670.) It was enacted "primarily because of the reprehensible practice of rebating which has been engaged in by some few licentiates of the healing arts, and which has cast an unwarranted and unmerited cloud upon the entire medical profession. The medical profession as a whole condemned such practices and sought to eliminate from their fold those members who engaged in this 'kick-back' system." (16 Ops. Cal. Atty. Gen. 18, 20 (1950).) The statute "was designed to prevent the nefarious practice by which patients were charged excessive prices for drugs and medications, appliances and like auxiliary services and commodities, in order that the physician and surgeon treating such patient would secure an additional hidden fee. By this method, the unsuspecting patient would have no knowledge that the fee he paid to the physician and surgeon for professional services was actually being substantially increased by a 'kick-back' made possible because he had been excessively charged by the pharmacist, laboratory, dispensing optician, etc." (*Id.* at p. 21.) At this time, the statute did not contain the language now found in subdivision (b), and instead was a straightforward prohibition on consideration for referrals.

Some fifteen years later, the case of *Blank v. Palo Alto-Stanford Hospital Center* (1965) 234 Cal.App.2d 377 (*Blank*) arose. In *Blank*, a hospital entered into an exclusive contract with a medical practice to operate its radiology facilities. A physician locked out of this agreement challenged it. He argued that the contract was "illegal because it provide[d] that the hospital gets 66 2/3 percent and the physician 33 1/3 percent of the gross income from the fees for the diagnostic service which is set by the hospital." (*Id.* at p. 390.) The doctor argued that this violated section 650 and the prohibition against the corporate practice of medicine and fee splitting. Concluding that the evidence "sustains the conclusion that the portion of the fees received was commensurate with the expense, direct and indirect, incurred by the hospital in connection with furnishing the diagnostic facilities," the court found no illegality. (*Ibid.*)

In 1989, *Beck v. American Health Group Internat., Inc.* (1989) 211 Cal.App.3d 1555, threw *Blank* into doubt. In *Beck*, the plaintiff physician sought to rely on an agreement by which he would become the Medical Director of Mental Health Services at

11

the defendant hospital and would be paid 10 percent of room and board charges for all general psychiatric patients at the hospital. (*Beck,* at p. 1559.) The court concluded that the agreement on which *Beck* relied was merely an unenforceable agreement to agree. (*Id*. at p. 1563.) However, the *Beck* court went on to state that even if the agreement were considered an enforceable contract, the agreement was illegal and therefore void. Specifically, the court found that the agreement violated section 650. The problem, according to *Beck*, was that the agreement linked the doctor's compensation to the number of psychiatric patients at the hospital, providing a financial incentive for the doctor to refer his own patients to the hospital. (*Id*. at p. 1656.) The physician argued that there was no violation because, like in *Blank*, the contract provided payment for medical services, not patient referrals. The court disagreed, because of an intervening amendment to section 650.[6] The *Beck* court concluded that, "for purposes of applicability of section 650, it is immaterial that the referring physician earns compensation by performing services if that compensation is subject to increase by his referral of patients." (*Beck,* at p. 1565.)

The medical community immediately took action.[7] The California Association of Hospitals and Health Systems sought an amendment to section 650 to overrule this language in *Beck* and reinstate *Blank*. (Attorney Charles Forbes, letter to General Counsel of California Association of Hospitals and Health Systems, Feb. 6, 1990, attached to Sen. Com. on Bus. and Prof. Background Information Request for Sen. Bill No. 2365.) It proposed language very similar to what was ultimately enacted as subdivision (b) of section 650. (*Id*. at p. 4; Stats. 1990, ch. 1532, § 1.) The legislative history clearly indicates that it was intended to codify the earlier *Blank* decision. (Cal.

---

[6]    Business and Professions Code section 650 had originally prohibited the payment of *unearned* consideration for a referral. A 1971 amendment removed the word, "unearned." (*Beck,* at p. 1565.) *Beck* found this changed the meaning of section 650.

[7]    We take judicial notice of the applicable legislative history.

Dept. of Consumer Affairs, Enrolled Bill Report on Sen. Bill No. 2365 (1989-1990 Reg. Sess.) as amended August 27, 1990, p. 2.)

In short, *Beck* has been overruled by statute, and *Blank* is again the law in California. Section 650 subdivision (b) permits contracts between physicians and non-physicians whereby compensation is based on a percentage of gross revenue, as long as the consideration is commensurate with the services rendered and/or facilities and equipment provided.

Thus, the only basis on which the contract between the doctor and the management company could be found illegal is if a finding were made that the consideration was *not* commensurate with the services rendered and facilities and equipment provided. If the trial court had made such a finding, we would uphold it if based on substantial evidence. But the court made no such finding and, on this record, could not have done so. The expert witness's declaration states only that using the 50-25-75 system (rather than the 120 percent of actual management costs) "would raise significant concerns . . . about whether the payments were bona fide payments for services other than the referral of patients . . . ." She does not attempt to resolve the very concerns that she raised.[8] The only evidence on this point is the arbitrator's award itself. The arbitrator concluded that, when the contract was terminated at the end of March 2012, the management company had paid expenses amounting to approximately $714,420.40. It had collected only $518,845.66 from the doctor. Adding the amount collected to the $286,776.95 awarded means that the management company would be paid a total of $805,622.61 on $714,420.40 of expenses – a profit of 12.8 percent. As these numbers demonstrate a rough correlation between the fees the management

---

[8] She similarly declared that "*[i]f* [management company] were to receive payments on referred patients after its management services ended that were unrelated to the value of its management services, such an arrangement *would* violate [s]ection 650[, subdivision] (b) . . . ." (Emphasis added.)

13

company incurred and the amounts it was entitled to collect under the 50-25-75 method, there is no violation of section 650 on this evidence.[9]

To the extent the doctor argues there was a violation of the prohibition against the corporate practice of medicine outside of section 650 and *Blank*, we again disagree. Determining whether the contractual relationship between a physician and a non-licensee results in the non-licensee's unlicensed practice of medicine requires a legal interpretation of the substantive provisions of the agreement. (55 Ops. Cal. Atty. Gen. 103 (1972).) The issue turns on whether the non-licensee exercises or has retained the right to exercise control or discretion over the physician's practice. (*Ibid.*; see *People v. Superior Court (Cardillo)* (2013) 218 Cal.App.4th 492, 498.) Our review of the terms of the management services agreement shows a strict delineation between the medical elements of the practice which the doctor controls, and the non-medical elements which the doctor has retained the management company to handle. The management company is not the doctor's employer nor his partner, and exercises no control over the doctor's

---

[9] The doctor argues that the arbitrator granted the management company "an ongoing percentage interest in the accounts receivable generated by [the doctor's] patients, many of which were referrals from other [management company] doctors. [Citation.] In doing so, the Award transmutes a collections-based cap on [management company]'s fees that was intended by the parties to serve as a stick to encourage diligent collection efforts by [management company], into a carrot for referrals measured as a percentage of revenues generated by such patients in perpetuity, whether or not [management company] is still providing any services to [the doctor]." Setting to one side that there is absolutely no evidence in the record before us that the "collections-based cap" was intended "to encourage diligent collection efforts," the doctor's argument is a mischaracterization of the arbitrator's award. The management company was not awarded a percentage of revenues generated by patients in perpetuity. Management company was simply awarded a percentage of revenues *to be collected* for services rendered to patients when management company was on the clock. Management company was terminated at the end of March 2012. Up until its date of termination, it supplied premises where patients were treated, equipment used on those patients, nursing staff which aided the physician in treating patients, and support staff which scheduled appointments and sent out initial bills. It is entitled to collect its share of the fees to be received from the patients for those pre-termination services, not for future services rendered by the doctor. The arbitrator awarded it no more.

practice. We see no way in which modifying the management company's compensation from 120 percent of costs to the 50-25-75 system – which, over the term of the agreement, correlated to less than 120 percent of costs – impermissibly changed the nature of the relationship.

C.  *There Was No Prejudicial Limitation on the Doctor's Evidence*

An arbitration award may be vacated if the "rights of the party were substantially prejudiced by . . . the refusal of the arbitrators to hear evidence material to the controversy . . . ." (Code Civ. Proc., § 1286.2, subd. (a)(5).) The doctor argues that the award must be vacated under this provision because the arbitrator, over his objection, limited his testimony in his case in chief to only one hour.

The statutory provision is "a safety valve in private arbitration that permits a court to intercede when an arbitrator has prevented a party from fairly presenting its case." (*Hall v. Superior Court* (1993) 18 Cal.App.4th 427, 439.) When a party contends it was substantially prejudiced by the arbitrator's exclusion of material evidence, a court should generally consider prejudice before materiality. (*Ibid.*) To find substantial prejudice, the court must first accept the arbitrator's theory and conclude the arbitrator might well have made a different award had the evidence been allowed. (*Burlage v. Superior Court* (2009) 178 Cal.App.4th 524, 531.)

Our review of the issue in this case is somewhat frustrated by the fact that there is no offer of proof in the record. That is, the record is limited as to what evidence, exactly, was not allowed. We have only the declaration of the doctor's counsel. Counsel stated that the doctor was examined at length as part of the management company's case; but that, when counsel wanted to examine the doctor as part of his own case in chief, the arbitrator limited counsel's examination to approximately one hour. Counsel represents that he tried to get as much testimony adduced as possible, but was unable to do so. He states that the doctor "was thereby precluded from testifying to some of his claimed items of damages and [counsel] had to withdraw them from [his] closing."

15

We must accept the arbitrator's theory and consider whether the arbitrator might well have made a different award had the evidence been allowed. The arbitrator concluded that the doctor materially breached the contract but the management company did not. The doctor's counsel's declaration indicates that the doctor was precluded from testifying as to "some of his claimed items of damages"; there is no assertion that the doctor was precluded from offering any testimony on issues of liability. As such, there is no possibility that the arbitrator might have made a different award had the excluded evidence been allowed.

## DISPOSITION

The judgment is affirmed. The Management Company shall recover its costs on appeal.[10]

RUBIN, J.

WE CONCUR:

BIGELOW, P. J.

GRIMES, J.

---

[10]    Management company seeks an award of attorney's fees as prevailing party on appeal. That request should be directed to the trial court. (See Cal. Rules of Court, rule 3.1702(c).)

16

Filed 1/28/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| EPIC MEDICAL MANAGEMENT, LLC, | B261541 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SC120141) |
| v. | |
| JUSTIN DOMINIC PAQUETTE, M.D., | |
| Defendant and Appellant. | |

     IT IS HEREBY ORDERED that the opinion filed in the above matter on December 29, 2015, is certified for publication with no change in the judgment.

_____

BIGELOW, P. J.           RUBIN, J.           GRIMES, J.