Filed 7/21/16  Winchester Community Assn v. Perrotta CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| WINCHESTER COMMUNITY ASSOCIATION, | C075562 |
| Plaintiff, Cross-defendant and Respondent, | (Super. Ct. No. SCV0029936) |
| v. | |
| CHARLES FRANK PERROTTA et al., | |
| Defendants, Cross-complainants and Appellants. | |

This case involves a dispute between homeowners Charles Frank Perrotta and Charlotte Van Warmerdam Perrotta (collectively the Perrottas) and their homeowners association Winchester Community Association (Association) over landscaping or the lack thereof.  Unable to resolve the dispute on their own, the parties participated in a mediation that resulted in a settlement agreement pursuant to which the Perrottas agreed to complete landscaping their property not later than September 15, 2011.  Before the

1

Perrottas could begin landscaping their property, they were required to submit a landscape plan and an updated site plan to the Winchester Design Review Committee (Committee) for approval.

On May 19, 2011, the Perrottas submitted "Landscape Development Plans," prepared by a licensed landscape architect, to the Committee. The Committee approved the landscape portion of the plans, but concluded the plans nevertheless were deficient because a proposed secondary driveway depicted therein was inconsistent with the settlement agreement, and there was no separate site plan.

On October 10, 2011, the Perrottas submitted a revised set of "Landscape Development Plans" to the Committee. The Association's counsel advised the Perrottas that the review of such plans would be "held in abeyance until such time as a site plan is also furnished to the Association."

Meanwhile, on September 23, 2011, the Association sued the Perrottas to enforce the settlement agreement. After the Association refused to review the Perrottas' revised plans, the Perrottas cross-complained, seeking cancellation of the settlement agreement and a declaration that the Association violated its own governing documents in its dealings with the Perrottas over landscaping.

Following a five-day bench trial, the trial court entered judgment in favor of the Association on its breach of contract cause of action and ordered the Perrottas to perform their obligations under the settlement agreement. The court declined to address the Perrottas' claim that the Association violated its governing documents on the ground the claim was superseded by the settlement agreement. The trial court later determined that the Association was the prevailing party and awarded it $159,269.61 in attorney fees and costs.

The Perrottas appeal, contending (1) the settlement agreement is unenforceable because it was never consummated, (2) even if it is enforceable, it did not require them to submit a separate site plan in addition to a landscape plan, (3) the September 15, 2011,

2

deadline was extended approximately three months, and (4) even if they were required to submit a separate site plan, the revised plans submitted on October 10, 2011, included such a plan. The Perrottas also assert that the trial court erred in declining to address their claim that the Association violated its own policies and procedures, and awarding the Association attorney fees and costs.

We shall conclude that the settlement agreement is enforceable and required that the Perrottas submit both a landscape plan and a site plan to the Association for approval before beginning work on their property, the September 15, 2011, deadline was extended 81 days, the trial court's implied finding that the revised plans submitted in October 2011 did not include a site plan is not supported by substantial evidence, and the Association prevented the Perrottas from performing under the settlement agreement by refusing to review those plans. Accordingly, we shall reverse the judgment entered in favor of the Association, as well as the postjudgment order awarding the Association attorney fees and costs, which is based on the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Winchester is a common interest development governed by the Davis-Stirling Common Interest Development Act (Davis-Stirling Act), which is set forth in Civil Code section 4000 et seq. and provides general rules for the governance of planned developments.[1] The community is comprised of upscale, single-family homes in the Sierra Foothills and is managed and maintained by the Association, which is governed by a board of directors (Board) and subject to a recorded declaration of conditions, covenants, and restrictions (CC&R's), the Bylaws of the Association (Bylaws), and the

---

[1]  In 2012, the Davis-Stirling Act was repealed and reenacted operative January 1, 2014. (Stats. 2012, ch. 180, §§ 1, 2.)  For ease of reference, unless otherwise specified, subsequent statutory references are to the former provisions of the Davis-Stirling Act, under which this case was decided.

3

Design Guidelines and Regulations (Design Guidelines). All lot owners in the community are members of the Association.

The Perrottas own lot 85, located at 1101 Holly Leaf Lane. As such, they are members of the Association and subject to the CC&R's, Bylaws, and Design Guidelines. They purchased the lot, which had been in foreclosure, on September 30, 2009. At that time, the lot contained a residence that was nearly complete and a driveway, but was devoid of any landscaping. The original owner/builder had submitted a site plan that had been approved by the Committee, but he had not submitted a landscape plan. It was a common practice, and completely acceptable, for owners to defer submission of a landscape plan.

Pursuant to section 5.01(a) of the CC&R's, subject to certain exceptions not applicable here, "prior to submittal to the County for building permits and before commencement of construction or installation of any Improvement within Winchester, the Owner planning such Improvement must submit to the Design Committee a written request for approval. The Owner's request shall include structural plans, specifications and plot plans satisfying the minimum requirements set forth in the Design Guidelines . . . ." "The term 'Improvement' . . . includes, without limitation, the construction, installation, alteration or remodeling of any Residence structures, garages, out buildings, walls, fences, swimming pools, landscaping, landscape structures, skylights, patios . . . or any other structure of any kind. Any clearing or grading of a Homesite or alternation of natural drainage courses shall be considered a work of 'Improvement' requiring approval hereunder."

The Design Guidelines set forth a "design review process," which must be followed for all major site and/or landscaping improvements. Improvement plans are reviewed by the Committee, which evaluates such plans on the basis of the Design Guidelines.

4

Appendix B to the Design Guidelines contains an "Approvals Checklist," which lists the various documents that must be submitted at each stage of the design review process. Owners are required to submit a site plan and a landscape plan at both the preliminary design and final development stages. A "Site Plan" is defined as a "1 [inch] = 20 [feet] min. scale showing property lines, Site Envelope, Construction Area, existing and proposed grades, existing vegetation and drainage patterns, easements, driveway, utility trench, building footprint with finished floor grades, parking areas, turnarounds, drainage improvements, fences/walls, patios, decks, pools and any other site amenities and identification of any trees to be removed." At the final review stage, a "Landscape Plan" is defined as a "plan at 1 [inch] = 20 [feet] min., including irrigation plan, lighting plan, proposed plant materials and sizes, trees to be protected during construction and trees to be removed, paving materials, water features, pools, patios, decks and any other significant design elements." The Association relies on these descriptions in their discussions concerning site and landscape plans.

On December 22, 2009, about three months after the Perrottas purchased their lot, Kyle Bodyfelt, the Association's property manager, directed the Perrottas to provide him with a copy of their "landscape plan" by January 8, 2010. The Perrottas responded that they were "focusing on completing the inside" of their residence and had yet to decide what they wanted outside or "locate and hire a competent landscape designer." Accordingly, they advised Bodyfelt that May 30, 2010, would be a "more realistic" date on which to submit the landscape plan.

On February 17, 2010, the Committee advised the Perrottas that their request for an extension to May 30 was denied and directed them to submit a landscape plan by March 19, 2010. The Committee explained that the Perrottas' occupancy of the residence "on a fairly regular basis without having submitted the required landscaping plans," constituted a clear violation of section 5.14(b) of the CC&R's, which requires that "[a]ll

5

approved landscaping" be completed by the time the county issues a certificate of occupancy.

In February or March 2010, the Perrottas retained Jeff Ambrosia, a licensed landscape architect employed by Yamasaki Landscape Architecture, to develop landscape construction documents for their property. At all relevant times herein, Ambrosia also served as a consultant to the Committee, and as such, reviewed landscaping documents of new homeowners. As a result, he was familiar with the CC&R's and Design Guidelines. The Perrottas instructed Ambrosia to prepare a landscape plan that would be accepted by the Association.

On March 25, 2010, Ambrosia sent the Committee a diagram showing a secondary driveway across the front of the residence that was intended to provide access to the front door. The Committee denied the Perrottas' request to install the proposed driveway.

On April 16, 2010, Bodyfelt and members of the Committee met with Charles Perrotta and Ambrosia on the Perrottas' property to discuss the proposed secondary driveway. A week later, the Committee wrote to the Perrottas and proposed three alternatives to the Perrottas' proposed secondary driveway. Ambrosia responded to the letter, noting that the options provided by the Committee "would require a tremendous expense" and result in an unnecessary hardship.

On May 26, 2010, the Committee notified the Perrottas that it was standing by its denial of their request for a "second driveway" and requested that the Perrottas meet with members of the Board and the Committee on June 15, 2010, "to discuss . . . a time frame for submittal and completion of landscape plans . . . ." The Perrottas advised the Committee that they had business out of the area on June 15, 2010, and would be on vacation in early July, and suggested a meeting in late July.

On July 16, 2010, the Board sent the Perrottas written notice of a hearing on August 3, 2010, to address various alleged violations of the Association's governing documents, including the lack of landscaping and failure to submit "plans and fee[s]."

6

The Perrottas advised the Board that they were unavailable on August 3, 2010, and on July 30, 2010, submitted a landscape plan for the property. According to Nancy Jakse, the Board president, the landscape plan contained "a number of elements . . . that were inconsistent with the site plan of the already approved plans" submitted by the prior owner. Accordingly, the landscape plans were not approved.

The hearing went forward on August 3, 2010, without the Perrottas. The Board determined that it needed more information and continued the hearing to October 6, 2010. Meanwhile, on August 4, 2010, the Committee wrote to the Perrottas and requested clarification as to whether they intended to use the previously approved site plan or submit a modified plan of their own.

At the October 6, 2010, hearing, the Perrottas indicated that they intended to complete the project according to the previously approved site plans, and Jakse informed them that there were many elements on the previously rejected landscape plan for which the Board had no "architectural information." The Perrottas agreed to submit a new landscape plan by the end of October 2010, and complete landscaping their property by the end of January 2011. The deadline for submitting the revised landscape plan was later extended to November 2010. Following the hearing, the parties continued to discuss the Perrottas' desire for a secondary driveway but were unable to resolve the issue. The Perrottas did not submit a revised landscape plan by the end of November 2010, and in January 2011, the parties agreed to mediate the dispute.

The mediation took place on April 1, 2011, before retired superior court judge Darrel Lewis. Board president Jakse and Committee chair Richard Breaux represented the Association at the mediation and were accompanied by the Association's counsel. The Perrottas and their counsel were also present. The mediation continued all day and ended with the formulation of a "Settlement Agreement." The document is seven pages in length, with one attachment. The mediator provided a three-page printed document with general terms as a courtesy to the parties to expedite the formulation of the

agreement. Some of the provisions set forth therein are crossed out, while others have been edited by hand. Specific terms negotiated by the parties and their attorneys are set forth in four handwritten pages. The document was executed by the parties and their attorneys.[2]

The first three printed pages provide in pertinent part: "The parties hereby agree to settle this dispute in its entirety on the terms set forth below." "[E]ach party waives . . . the right to any known claims" against the other. "It is the intent of the parties that this agreement is binding and enforceable." "This Agreement represents the complete understanding between the parties."

The remainder of the agreement is handwritten. It provides in its entirety:

"This agreement pertains to driveway and landscape issues only. All other issues are dropped at this time.

"Both parties agree that the goal of this agreement is to complete the landscaping and driveway of the residence in question and to obtain a certificate of occupancy from Placer County at the earliest practicable date.

"Perrotta agrees to obtain [a] signed final inspection from Placer County on all permits relating to the subject property not later than September 15, 2011.[3]

"The above deadline of September 15, 2011 shall be extended by the number of calendar days that elapse between the simultaneous submission date of landscape plans

---

[2] Unbeknownst to the Association's representatives, Charles Perrotta signed Charlotte Perrotta's name to the settlement agreement. At trial, the Perrottas' counsel represented that "the Perrottas don't claim that the [settlement agreement] is not enforceable" based on Charlotte Perrotta's failure to sign it and stipulated that "that's not an issue and it can't be raised later on as far as a defense."

[3] The trial court assumed, and the parties do not dispute, that the Perrottas were required to complete all construction, including landscaping, in order to obtain a "signed final inspection" from the county.

and separate site plans to Winchester and the date Perrotta is notified of approval of both said plans.

"The above deadline of September 15, 2011 shall be extended additionally by the number of calendar days that elapse between the submission date of any necessary plans to Placer County and the date Perrotta is notified of approval of said plan.

"Perrotta will submit payment of $300 simultaneously with submission of the landscape plans to Winchester.

"Perrotta will submit payment of $5,000 as a compliance deposit to Winchester simultaneously upon receiving the stamped site plans and landscape plans. Said deposit shall be placed in escrow and returned to Perrotta upon completion of the site plans and landscaping plans referred to above. See Section 5.3 of Winchester design guidelines and regulations. Final inspection of the property will be to determine that the Perrottas are in compliance with the plans.

"Perrotta agrees to obtain a $75,000 completion bond, prior to starting construction, wherein Winchester is solely named as beneficiary of the bond, to be paid to Winchester in the event Perrotta fails to complete their obligations as specified in this agreement. The parties agree that each party will pay 50% of the fees for obtaining this bond.

"Winchester agrees to drop the April 6, 2011 compliance and fine meeting.

"The parties agree that in the event that Perrotta submits a landscape and/or site plan which envisions construction of a second driveway/turnaround within the shaded portion of the setback area as depicted in Attachment A & said plans are otherwise in compliance with the Association['s] governing documents & Design Review Guidelines, the Association agrees to issue Perrottas a variance to permit construction of said

9

driveway [within] the shaded portion of the setback in Attachment A.**[4]** The parties further agree and understand that the Association's issuance of a variance does not otherwise supersede or replace any additional requirements that may be required by the County for approval of said plan(s) &/or issue of a variance for construction [within] the setback.

"The Association further represents that as of the date of this agreement, the Association is of the opinion that that Perrotta building structure is in compliance with the Association's governing documents and Design Review Committee Guidelines."

On May 19, 2011, the Perrottas submitted a seven-page set of "Landscape Development Plans" and a $300 landscape review fee to the Committee. The plans were prepared by the Perrottas' landscape architect Ambrosia. In addition to a "Cover Sheet," the plans consist of the following pages: "Amenities Plan"; "Hardscape Plan"; "Planting Plan"; "Irrigation Plan"; "Lighting Plan"; "Planting Details"; and "Irrigation Details." Among other things, the plans showed property lines, site envelope, building envelope, building footprint, proposed secondary driveway, fencing, retaining and seating walls, flagstone and asphalt paving, hot tub and concrete pad, pizza oven, stepping stones, metal gate, existing rock shale, and existing drainage canal.

Jakse and Breaux reviewed the plans and found them deficient. In a letter dated May 25, 2011, Breaux informed the Perrottas that "per page 4 of the mediation settlement agreement, you were required to simultaneously submit landscape plans <u>and separate site</u> plans for approval. Since you failed to submit site plans for architectural review to replace or modify the currently approved . . . site plan sheets . . . , no approval action can

---

**4**   Attachment A is an enlarged copy of a portion of the previously approved site plan submitted by the original owner, a portion of which was shaded at the mediation to reflect the area in which the Association agreed to allow the Perrottas to construct a secondary driveway.

10

be taken by the [Committee] relative to the landscape plans. As has been communicated many times before, landscape plans must conform to approved architectural plans." Breaux continued, "There are numerous elements depicted on your landscape plans that are beyond the scope of landscape review and must go through architectural approval; e.g., the driveways, parking pad, spa, expanded deck, retaining walls, fencing, and gate. Any element shown on sheets 1 and 2 of your currently-approved plans that you don't intend to install needs to be removed from your site plan. Similarly, any new or modified elements must be shown with supporting engineering/architectural detail, if required. The proposed site plan must also reflect the grading and drainage modifications that go along with your new or modified elements." Breaux further advised that the landscape elements of the plans (planting, irrigation, & lighting) had been reviewed by the Committee's outside landscape review consultant, who saw no issues, but explained that "approval of the landscape plans can only occur when site plans have been approved first or simultaneously." Finally, Breaux indicated that the "second driveway/turnaround" depicted in the plans extended beyond the shaded area of the setback as agreed to in attachment A to the settlement agreement and noted that "this issue will have to be corrected" in order for "your site plan to be approved when you submit it."

Shortly thereafter, Jakse, Breaux, Bodyfelt, and Ambrosia met on the Perrottas' property to discuss the proposed secondary driveway. During the meeting, Ambrosia acknowledged that the proposed driveway depicted in the plans extended beyond the area provided for in attachment A to the settlement agreement and provided a revised layout, which he "put on the ground so that [Jakse and Breaux] could see that it truly did fit within the shaded area." The Association was concerned that the county might not approve the variance agreed to at the mediation, and Jakse suggested that the Perrottas obtain approval from the county for the proposed driveway before submitting revised plans to the Committee to avoid wasting money on engineering expenses.

11

Sometime prior to June 30, 2011, Ambrosia, on behalf of the Perrottas, submitted "an exhibit [to the county's planning division] that showed what [they] were trying to do" in terms of the driveway. On June 30, 2011, the Perrottas met with the county's senior planner, and on August 22, 2011, were advised that the agency's director had approved their "request to construct the driveway as shown on the draft Yamasaki plan," contingent upon the submission of "a new grading plan for review and approval by the Placer County Engineering and Surveying Division prior to initiating work on the driveway and/or landscaping." On September 19, 2011, the county advised the Perrottas that a grading permit was not required.

Meanwhile, on August 30, 2011, the Association wrote to the Perrottas, reminding them that the settlement agreement "requires you to 'obtain a signed final inspection from Placer County on all permits relating to the subject property not later than September 15, 2011,' " and noted that "[w]ith less than a month to complete your project, you have yet to obtain landscape and site plans stamped by Winchester, and to pay the $5,000 compliance deposit, both of which are prerequisites to obtaining final County approvals."

The Perrottas did not respond to the Association's August 30, 2011, letter, and on September 23, 2011, the Association sued the Perrottas for breach of the settlement agreement and specific performance.

On October 10, 2011, Ambrosia, on behalf of the Perrottas, submitted a revised ten-page set of "Landscape Development Plans" to the Association. In addition to a "Cover Sheet," the plans consist of the following pages: "Amenities Plan"; "Grading & Drainage Plan"; "Grading Profile"; "Hardscape Plan"; "Construction Details"; "Planting Plan"; "Irrigation Plan"; "Lighting Plan"; "Planting Details"; and "Irrigation Details." The proposed secondary driveway depicted in the revised plans falls within the area set forth in attachment A to the settlement agreement. As compared to the May 2011 plans, the revised plans "added a tremendous amount of detail in terms of grading, drainage, [and] driveway layout," and included elevations as requested by the Association.

12

On October 20, 2011, the Association advised the Perrottas that "[t]he tendered landscape development plans will be held by the Association with the review of those plans by the Association's Design Review Committee being held in abeyance until such time as a site plan is also furnished to the Association."

On February 14, 2012, the Perrottas filed a cross-complaint against the Association for cancellation and rescission of the settlement agreement and declaratory relief. Among other things, the Perrottas sought a declaration that the Association violated and continues to violate its own CC&R's and Design Guidelines in the landscape approval process.

Following a five-day bench trial in May 2013, the trial court entered judgment in favor of the Association and against the Perrottas. The trial court found that the Perrottas breached the settlement agreement and ordered them to perform their obligations there under the same. In particular, the trial court determined that the settlement agreement constituted a valid and enforceable agreement and rejected the Perrottas' claim that the agreement was ambiguous as to whether they were required to submit both a landscaping and a site plan to the Association for approval. The court found that "[u]nder a plain meaning interpretation, the Settlement Agreement required [Perrotta] to submit both landscape plans and site plans," and determined that "no site plan [had] ever been submitted." The trial court rejected the Perrottas' claim that the September 15, 2011, deadline had been extended and ordered the Perrottas "to file a separate site plan . . . as defined in the Appendix to the Design Guidelines, within 60 days from the date this Judgment is entered." The trial court found against the Perrottas on their cross-complaint. In particular, the trial court found that the Perrottas' claim that the Association violated the CC&R's and Design Guidelines in failing to approve the Perrottas' plans was superseded by the settlement agreement and therefore declined to address it.

13

Following the trial, the court determined that the Association was the prevailing party and entered a postjudgment order awarding the Association $159,269.61 in attorney fees and costs.

## DISCUSSION

### I

### The Settlement Agreement Is Enforceable

The Perrottas contend that "[t]he trial court erred in concluding that an enforceable agreement existed because the agreement was never consummated." The Perrottas rely on the following language in the settlement agreement in support of their contention: "**Cooperation on Documents:** All parties agree that further documents will need to be prepared, formulated, signed or filed in order to consummate this agreement. All parties agree to cooperate in this process." The Perrottas claim that because no further documents were prepared or signed, the settlement did not become a binding or completed contract. They are mistaken.

"In interpreting the settlement agreement, we apply the general rules of contract interpretation. [Citation.] 'The goal of contractual interpretation is to determine and give effect to the mutual intention of the parties. [Citations.]' [Citation.] Thus, 'a "court's paramount consideration . . . is the parties' objective intent when they entered into [the contract]." [Citations.]' [Citation.] 'A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.' [Citation.] ' "If a contract is capable of two constructions courts are bound to give such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect . . . ." [Citations.]' [Citation.] In addition, '[a]n interpretation which gives effect is preferred to one which makes void.' [Citation.]" (*Khavarian Enterprises, Inc. v. Commline, Inc.* (2013) 216 Cal.App.4th 310, 318.) Language in a contract must be construed in the context of that instrument as a whole. (*Haering v. Topa Ins.* (2014) 244 Cal.App.4th 725,

14

733.)  Whether the settlement agreement is enforceable involves a question of contract interpretation, which we review de novo.  (*Crosby v. HLC Properties, Ltd.* (2014) 223 Cal.App.4th 597, 602.)

Here, in addition to the language relied upon by the Perrottas, the settlement agreement provides, "It is the intent of the parties that *this agreement is binding and enforceable*."  (Italics added.)  It does not provide that the agreement shall be binding and enforceable only upon the preparation and execution of additional documents, as the Perrottas appear to suggest.  To the contrary, the parties deleted a provision that provided for the preparation of a more formal agreement.[5]  As the Perrottas point out, the parties agreed that "further documents will need to be prepared, formulated, signed or filed in order to *consummate* this agreement."  (Italics added.)  Consummate means "[t]o bring to completion," "[t]o achieve," "to fulfill," "to perfect," and "to carry to the highest degree." (Black's Law Dict. (10th ed. 2014) p. 384, col. 1.)  The failure to consummate an agreement does not make it unenforceable.  (See, e.g., *Schwartz v. Handley* (1927) 83 Cal.App.434, 440-441.*)*  When the settlement agreement is considered as a whole and in the context in which it was made, it is clear that the preparation or execution of additional documents was *not* required to make the agreement enforceable.

*Beck v. American Health Group International*, cited by the Perrottas, is distinguishable.  There, the court concluded that a letter did not constitute a binding contract, but "was merely an 'agreement to agree', which cannot be made the basis of a cause of action."  (211 Cal.App.3d 1555, 1563, superseded on other grounds as noted in *Epic Medical Management, LLC v. Paquette* (2015) 244 Cal.App.4th 504, 515-516 & fn.

---

[5]   The following provision, which immediately preceded the provision relied upon by the Perrottas, is crossed out:  "**More Formal Agreement Anticipated:**  The parties agree that this agreement, although binding and enforceable, will be replaced by, or supplemented by, a more formal agreement prepared by counsel within the next seven calendar days."

6.)  The letter under consideration in that case began:  " 'It is a pleasure to draft the *outline of our future agreement . . . .*'  (Italics added.)"  (*Beck,* at p. 1562.)  After outlining the terms of the proposed agreement, the letter asked the plaintiff to sign it " 'if this is a general understanding of the agreement,' in order that the Hospital may 'forward it to Corporate Counsel *for the drafting of a contract*.'  (Italics added.)"  (*Id.* at p. 1563.)  The letter concluded:  " 'When we have a draft, we will discuss it, and *hopefully shall have a completed contract* and operating unit in the very near future.'  (Italics added.)"  (*Ibid.*)  The settlement agreement at issue here contained no such language; rather, it expressly provided that "[i]t is the intent of the parties that *this agreement is binding and enforceable*."  (Italics added.)

## II
### The Perrottas Were Required to Submit a Site Plan

The Perrottas next contend that the trial court erred in determining that the settlement agreement required them to submit a site plan in addition to a landscape plan.  We disagree.

"The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties.  'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation.  (Civ. Code, § 1636.)  Such intent is to be inferred, if possible, solely from the written provisions of the contract.  (*Id*., § 1639.)  The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" (*id.,* § 1644), controls judicial interpretation.  (*Id.,* § 1638.)' [Citations.]"  (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18.)  "The factual context in which an agreement was reached is also relevant to establish its meaning unless the words themselves are susceptible to only one interpretation.  [Citations.]"  (*Nish Noroian Farms v. Agricultural Labor Relations Bd.* (1984) 35 Cal.3d 726, 735; see

16

Civ. Code, § 1647 ["A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates."]; see also Code Civ. Proc., § 1860.)

The Perrottas are correct that the agreement does not contain a provision that expressly directs or commands them to file a separate site plan; however, such an intent can be inferred. As the Perrottas acknowledge, the agreement repeatedly references the submission and approval of landscape plans *and* site plans. It also provides that the September 15, 2011, deadline "shall be extended by the number of calendar days that elapse between the *simultaneous submission date of landscape plans and separate site plans* to Winchester and the date Perrotta is notified of approval of *both* said plans." (Italics added.)

While the agreement itself does not define the terms "site plan" and "landscape plan," Jakse testified that she brought a copy of the previously approved site plan to the mediation to facilitate the discussion, the parties referred to that plan at the mediation, and a portion of that plan is attached to the settlement agreement to illustrate where the proposed secondary driveway could be located. Moreover, the terms "landscape plan" and "site plan" are defined in appendix B to the Design Guidelines, and as such, have a special meaning, and the agreement itself plainly contemplates that such plans must comply with the Association's governing documents, including the Design Guidelines. With respect to the proposed secondary driveway, the agreement provides, "[I]n the event that Perrotta submits a landscape and/or site plan which envisions construction of a second driveway/turnaround within the shaded portion of the setback area as depicted in Attachment A *& said plans are otherwise in compliance with the Association['s] governing documents & Design Review Guidelines*, the Association agrees to issue Perrottas a variance to permit construction of said driveway [within] the shaded portion of the setback in Attachment A." (Italics added.)

17

We agree with the trial court that "[c]onsidering both the common usage among the parties and the definitions in the Design Guidelines of the terms 'landscape plan' and 'site plan,' of which both parties were reasonably aware during the mediation proceedings, the only reasonable interpretation is that the Settlement Agreement required two different kinds of plans." When read as a whole and considered within the context in which it was entered, we find that the parties intended that the site plans submitted by Perrotta comply with the Association's governing documents, including the Design Guidelines. The trial court did not err in so concluding.

### III
### The September 15, 2011, Deadline Was Extended 81 Days

The Perrottas contend that the trial court erred in finding that they breached the settlement agreement because the September 15, 2011, deadline automatically was extended by approximately three months -- the number of days that elapsed between the submission of the proposed secondary driveway plan to the county and the county's approval of the same.[6] We agree that the deadline was extended, however, as we shall explain, it does not follow that the Perrottas did not breach the settlement agreement.

Sometime before June 30, 2011, when the Perrottas met with the county's senior planner, Ambrosia submitted "an exhibit [to the county's planning division] that showed what [they] were trying to do" in terms of the secondary driveway. On August 22, 2011, the Perrottas were advised that the agency's director had approved their "request to construct the driveway as shown on the draft Yamasaki plan," contingent upon the submission of a "new grading plan," and on September 19, 2011, the county advised the Perrottas that a grading permit was not required.

---

[6]   The Association does not address the Perrottas' argument regarding an extension in its respondent's brief.

18

In the trial court, the Perrottas argued that the September 15, 2011, deadline was extended by "about a three-month period," the amount of time that elapsed between Ambrosia's submission of "information to the County requesting approval for the driveway," and the time the Perrottas actually received the county's approval. The trial court rejected the Perrottas' argument on the grounds that they failed to notify the Association of their attempt to obtain county approval or request an extension. Whether the trial court erred in finding the deadline was not extended involves a question of contract interpretation, which we review de novo. (*Crosby v. HLC Properties, Ltd., supra,* 223 Cal.App.4th at p. 602.)

The settlement agreement states that the deadline "*shall* be extended . . . by the number of calendar days that elapse between the submission date of any necessary plans to Placer County and the date Perrotta is notified of approval of said plan." (Italics added.) The agreement says nothing about notifying the Association or requesting an extension. The absence of such language coupled with the parties' use of the term "shall" compels us to conclude that the deadline was extended during the specified period. (Italics added.) While not required under the settlement agreement, we note that it is undisputed that the Association knew sometime in June 2011 that the Perrottas were attempting to obtain the county's approval of the proposed secondary driveway, and knew prior to filing the underlying lawsuit that the Perrottas had obtained conditional approval of the same. Indeed, it was Jakse who suggested that the Perrottas seek the county's approval before resubmitting their plans to the Association.

Having concluded that the deadline was in fact extended, we must determine by how long. We find that the deadline was extended by the number of calendar days that elapsed between the time Ambrosia submitted his "exhibit" outlining the proposed secondary driveway to the county for approval, and September 19, 2011, the date the Perrottas were notified that a grading permit was not required, thereby removing the contingency for approval. While it is unclear when Ambrosia submitted information

19

concerning the proposed secondary driveway to the county, the latest possible date was June 30, 2011, when the Perrottas met with the county's senior planner. Eighty-one calendar days elapsed between June 30, 2011, and September 19, 2011, thereby extending the deadline to December 5, 2011. As previously discussed, the plans submitted in May 2011 did not comply with the settlement agreement because the secondary driveway depicted therein extended beyond the area agreed to in the settlement agreement. The Perrottas submitted a revised set of plans in October 2011, before the December 5, 2011, deadline, which the Association refused to review on the ground the plans did not include a site plan. In concluding that the Perrottas never filed a site plan, the trial court implicitly agreed. Whether the trial court erred in concluding that the Perrottas breached the settlement agreement turns on whether there is substantial evidence to support its finding that the Perrottas failed to submit a site plan. We address that issue below.

IV
There is No Substantial Evidence to Support the Trial Court's Finding That the Perrottas
Failed to Submit a Site Plan

The Perrottas contend that the trial court erred in concluding that they failed to submit a site plan. We agree.

As previously discussed, under the settlement agreement, the Perrottas were required to simultaneously submit a landscape plan and separate site plan to the Association for approval before beginning work on their property. (*Ante,* at p. 18.) A "Site Plan" is defined in appendix B to the Design Guidelines as follows: "1 [inch] = 20 [feet] min. scale showing property lines, Site Envelope, Construction Area, existing and proposed grades, existing vegetation and drainage patterns, easements, driveway, utility trench, building footprint with finished floor grades, parking areas, turnarounds, drainage improvements, fences/walls, patios, decks, pools, and any other site amenities and identification of any trees to be removed." In contrast a "Landscape Plan" is defined as a

20

"plan at 1 [inch] = 20 [feet] min., including irrigation plan, lighting plan, proposed plant materials and sizes, trees to be protected during construction and trees to be removed, paving materials, water features, pools, patios, decks and any other significant design elements." Jakse testified that she relied on these definitions in her discussions regarding site and landscape plans.

On October 10, 2011, the Perrottas submitted a revised ten-page set of "Landscape Development Plans" to the Association for approval. While pages 6 through 10 relate to the elements required for a landscape plan (planting, irrigation, & lighting), pages 1 through 5 relate to the elements set forth in the definition of a site plan. Specifically, the "Amenities," "Hardscape," and "Grading & Drainage" plans each show property lines, site envelope, building envelope, elevations, building footprint, existing driveway, proposed secondary driveway, decks, fences, walls, patios, concrete pads, and various other site amenities. Moreover, details regarding the hardscape elements are provided on the hardscape plan, and details regarding grading and drainage for the site, including proposed and existing contour, are provided in the grading and drainage plan. Grading profiles for the proposed secondary driveway and retaining wall are shown on the grading profile plan, and architectural details for the decks, stone columns, and metal gate are shown on the construction details plan.

While none of these plans are labeled "site plan," we agree with the Perrottas that it is the documents' content, not their name, that is controlling. Stated another way, the absence of the term "site plan" and the submission of pages 1 through 5 as part of a set of plans entitled, "Landscape Development Plans," does not provide substantial evidence that the Perrottas failed to submit a site plan, where, as here, pages 1 through 5 contain most, if not all, of the elements required for a site plan as that term is defined in appendix B of the Design Guidelines. No evidence was presented as to why these documents did not constitute a site plan, other than the fact that they were not labeled as such.

21

Having concluded (1) that there is not sufficient evidence to support the trial court's implied finding that the revised October 2011 plans did not include a site plan, and (2) that the September 15, 2011, deadline was extended 81 days to December 5, 2011, it cannot be said that the Perrottas breached the settlement agreement. By refusing to review the revised plans, the Association prevented the Perrottas from moving forward and performing under the settlement agreement. We express no opinion as to whether the revised plans comply with the Association's governing documents. We find simply that the trial court erred in concluding that the revised plans did not include a site plan. Whether the plans comply with the Association's governing documents is for the Association to determine in the first instance.

Because the trial court's grant of specific performance was predicated on its conclusion that the Perrottas failed to submit a site plan, the judgment is reversed.[7] Because we reverse the judgment in favor of the Association, the award of attorney fees and costs based on that judgment must also be reversed. (*Poseidon Development, Inc. v. Woodland Lane Estates* (2007) 152 Cal.App.4th 1106, 1120.)

V

The Perrottas Failed to Establish the Trial Court Erred in Declining to Address Their Claim That the Association Violated Its Own Procedures and Rules

Finally, the Perrottas claim that the trial court erred in failing to address their claim, set forth in their cross-complaint, that the Association violated its own CC&R's and Design Guidelines in the landscape review process. As we shall explain, the Perrottas have failed to support their assertion with argument or citation to relevant authority, and thus, we need not consider their claim.

---

[7] Because we reverse the judgment on this ground, we need not consider the Perrottas' alternative claim that the judgment should be reversed because the trial court erred in validating the results of the 2011 election of the Board.

22

The trial court determined that the settlement agreement superseded the parties' respective claims concerning violations of the CC&R's and Design Guidelines, and on that basis, declined to address them. In doing so, the trial court observed that "the parties reached a full agreement of all their disputes" and "are each bound by the terms" of that agreement.

Conspicuously absent from the Perrottas' briefing on appeal is any argument or citation to authority regarding what impact, if any, the settlement agreement had on their claim. Instead, they argue the merits of their claim, i.e. that the Association violated the CC&R's and Design Guidelines. Given the Perrottas' failure to expand on their argument that the trial court erred in declining to address their claim with either argument or citation to relevant authority, we need not consider it. (See *People v. Hardy* (1992) 2 Cal.4th 86, 150.) Moreover, absent any such argument or citation to authority, the Perrottas cannot establish the trial court erred in declining to address their claim.

DISPOSITION

The judgment and postjudgment award of attorney fees are reversed. Promptly following the date of the remittitur being issued in this case, the Association shall provide the Perrottas "with either written notice of approval or disapproval or with written suggestions of changes required for approval" of the October 2011 plans in accordance with section 5.09 of the CC&R's. The Perrottas shall have 56 days following the date of the remittitur being issued to complete the landscaping of their property and obtain a signed final inspection from Placer County on all permits relating to the subject property in accordance with the settlement agreement, unless the deadline is extended as provided

for in the agreement.[8]  The parties shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(5).)



　　　　　　　　　　　　　　　　　　　　　　　　　/s/　　　　　　　　　　　　　
　　　　　　　　　　　　　　　　　　　　　　　Blease, Acting P. J.


We concur:



　/s/　　　　　　　　　　　
Nicholson, J.



　/s/　　　　　　　　　　　
Hull, J.

---

**8**　While the deadline was extended 81 days, 25 days elapsed between the September 15, 2011, deadline and October 10, 2011, the date the Perrottas submitted the revised plans, leaving 56 days.