Filed 8/15/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE ex rel. ALLSTATE INSURANCE COMPANY et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>DISCOVERY RADIOLOGY PHYSICIANS, P.C., et al.,<br><br>Defendants and Respondents. | B315264<br><br>(Los Angeles County Super. Ct. Nos. 20STCV45151 & 20STCV42672) |
| THE PEOPLE ex rel. ALLSTATE INSURANCE COMPANY et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>ONESOURCE MEDICAL DIAGNOSTICS, LLC, et al.,<br><br>Defendants and Respondents. | |

APPEALS from judgments of the Superior Court of Los Angeles County, William F. Fahey, Judge. Reversed with directions.

Knox Ricksen, Thomas E. Fraysse, and Maisie C. Sokolove for Plaintiffs and Appellants.

Katten Muchin Rosenman, Ryan M. Fawaz, and Christopher B. Maciel for The Coalition Against Insurance Fraud as Amicus Curiae on behalf of Plaintiffs and Appellants.

Hanson Bridgett, Katherine A. Bowles, and Adam Hoffman for Defendant and Respondent Discovery Radiology Physicians, P.C.

Proskauer Rose, Vinay Kohli, and Mark D. Harris, for Defendants and Respondents Sattar Mir, 1st Source Capital, LLC, and OneSource Medical Diagnostics, LLC.

Law Offices of Vatche Chorbajian and Vatche Chorbajian for Defendants and Respondents Expert MRI, P.C., Sana Khan, M.D., and Adil Mazhar, M.D.

—————————

Allstate Insurance Company and several of its affiliates (collectively, Allstate) brought qui tam actions on behalf of the State of California alleging insurance fraud under the California Insurance Frauds Prevention Act (IFPA) (Ins. Code, § 1871 et seq.) and the Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17000 et seq.)[1] against three medical corporations, a medical management company and its parent company, four physicians, and Sattar Mir, an individual. The operative

_____

[1]     Subsequent undesignated statutory references are to the Business and Professions Code.

complaints allege that while the medical corporations hold themselves out as providers of radiology services, they in fact act as radiology "brokers," sending patients to radiology facilities and radiologists with which the purported medical corporations have contracted. The complaints further allege that although the medical corporations appear to be owned and controlled by licensed physicians, as state law requires, they are in fact controlled by Mir, who is not a physician, and/or by his medical management company. Finally, the complaints allege that these facts were not disclosed on bills submitted to Allstate under contracts of insurance, and Allstate would not have paid the claims submitted by the medical corporations had it known the true facts.

The trial court found the complaints failed to state causes of action under the IFPA and the UCL because they were not pled with requisite specificity, the business models alleged were lawful, and one of the actions was time-barred. We conclude that the operative complaints adequately plead causes of action under both statutes, and thus we will reverse the orders sustaining the demurrers and judgments of dismissal.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Allstate's fraud actions; the initial demurrers.

Allstate Insurance Company is an insurance company licensed to issue automobile insurance policies in California. In 2020, Allstate filed two qui tam actions alleging insurance fraud in violation of the IFPA and the UCL. The first action (the

---

[2]    The Coalition Against Insurance Fraud submitted an amicus brief in support of Allstate, to which defendants have filed responses.

Discovery action) was filed against Discovery Radiology Physicians, P.C. (Discovery Radiology), a professional medical corporation; Mir; and radiologists Drs. Safvi and Feske. The second action (the OneSource action) was filed against Mir; OneSource Medical Diagnostics, LLC (OneSource), a medical management company owned by Mir; 1st Source Capital, LLC (1st Source), OneSource's parent company; Safvi Medical Corporation (Safvi Medical) and Expert MRI, P.C. (Expert MRI), professional medical corporations; and radiologists Drs. Safvi, Mazhar, and Khan.[3] In brief, the complaints alleged that the three medical corporations—Discovery Radiology, Expert MRI, and Safvi Medical—were formed and controlled by Mir, who is not a physician, to broker radiology services. The medical corporations solicited patients, referred the patients to MRI facilities and radiologists with whom Mir had contracted, and then billed Allstate for the MRIs. The bills represented that the MRIs had been performed by the defendant medical corporations, but the MRIs actually were performed at MRI facilities whose identities were not disclosed, and were read by radiologists under contract with the medical corporations. The resulting bills falsely identified the technical and professional services as having been provided by one of the three defendant medical corporations and grossly inflated the fees for the services provided. Allstate alleged it would not have paid the claims for services purportedly rendered by the three professional corporations had it known of the false statements and fraudulent markups.

Defendants demurred to Allstate's initial complaint in the Discovery action, and Allstate then filed a first amended

---

[3] All defendants except Dr. Safvi, Dr. Feske, and Safvi Medical are respondents in this appeal.

4

complaint, to which defendants again demurred.  Separately, defendants demurred to the complaint in the OneSource action.

The trial court sustained the demurrer in the OneSource action, finding that the complaint did not plead fraud with sufficient specificity.  The court granted Allstate "one opportunity" to amend its complaint, ordering that as to all named defendants, the amended complaint "shall allege specific facts as to how each of the 2,300 billing statements was fraudulent.  These allegations shall be backed up by an attached spreadsheet exhibit which contains seven columns listing:  (1) the dates, in chronological order, of each alleged false bill; (2) the corresponding billing or claim number; (3) the person or entity who prepared the bill; (4) the name of the MRI facility involved; (5) the total charge on each bill; (6) the person or entity transmitting the billing statement to Allstate; and (7) the alleged false statement made on that bill."

On May 17, 2021, the court ordered the Discovery action and the OneSource action related and sustained the demurrer to the first amended complaint in the Discovery action for the same reasons set forth in its order sustaining the demurrer in the OneSource action.

## II.     The amended complaints.

### A.     The Discovery action.

Allstate filed a second amended complaint in the Discovery action on June 1, 2021.  It alleged as follows:

In about May 2015, Mir created Discovery Radiology as a professional medical corporation.  Fictitious name permits filed with the Medical Board of California described Dr. Feske, and later Dr. Safvi, as the president and sole shareholder of Discovery

5

Radiology. In fact, however, Discovery Radiology was owned, operated, and controlled by Mir, who is not a doctor and has no medical training. Further, although documents filed with the California Secretary of State and the Medical Board of California represented that Discovery Radiology was a diagnostic radiology practice, Discovery Radiology did not administer or interpret MRIs. Instead, Mir, through Discovery Radiology, solicited and accepted referrals of individuals with personal injury claims, entered into contracts with diagnostic radiology facilities to administer the MRIs and with radiologists to interpret the MRI images, referred patients to contract facilities and radiologists in exchange for kickbacks or a fee-split, and then prepared false, fraudulent or misleading bills that significantly marked up the costs of medical services for submission to insurers, including Allstate. Had Allstate known of these facts, it would not have paid the claims.

Allstate alleged that these referral and billing practices gave rise to causes of action for violations of the IFPA because Mir steered patients to diagnostic radiology facilities and radiologists, and presented or caused to be presented insurance claims containing false or fraudulent statements, including that radiology services had been provided by Discovery Radiology, in violation of Insurance Code section 1871.7, subdivisions (a) and (b) of the IFPA. Allstate further alleged that these actions constituted unlawful, unfair, or fraudulent business acts or practices within the meaning of the UCL.

Attached to the complaint was a spreadsheet identifying 238 allegedly false claims submitted to Allstate by Discovery Radiology. For each claim, the spreadsheet identified the

6

treatment date, claim number, provider name, billed amount, and name of the attorney who submitted the claim.

### B.     The OneSource action.

Allstate filed a first amended complaint in the OneSource action on May 14, 2021.  It alleged as follows:

Mir is not a doctor and has no medical training.  In about January 2017, Mir formed OneSource (initially called Injury MRI Network, LLC), which was owned, operated, and controlled solely by Mir through 1st Source, another LLC he owns, operates, and controls.  OneSource holds itself out as providing management services for medical practices, but in fact OneSource enters into written contracts with diagnostic radiology facilities and radiologists to refer patients for radiology services.  These contracts give Mir complete control over the selection of diagnostic radiology facilities to which patients are sent, the selection of physicians to read and interpret MRIs, the preparation of billing statements, including determining the amount billed for the services rendered and the billing codes used, and the distribution of profits.  By selecting radiology sites and radiologists, and controlling billing and collection, Mir and his management company engage in the unlawful practice of medicine.

Additionally, Mir incorporated two purported professional medical corporations, Expert MRI and Safvi Medical.  On paper, it appears that Drs. Mazhar and Khan own, operate and control Expert MRI, which holds itself out to the public as a diagnostic radiology practice that performs and interprets MRIs at 18 locations in Southern California.  Likewise, it appears that Dr. Safvi owns, operates, and controls Safvi Medical, which holds itself out as performing MRI interpretation and analysis from an

7

office in Bellflower, California.  In reality, however, Mir, through OneSource and 1st Source, "controls all aspects of" Expert MRI and Safvi Medical.

"The scheme . . . is relatively simple. . . .  [Mir] market[s] the comprehensive diagnostic radiology services purportedly provided by OneSource, Expert, or [Safvi Medical] primarily to workers' compensation and automobile-accident personal injury attorneys, including those whose clients have claims for personal injury against [Allstate policies].  After receiving patient referrals as a result of the marketing, Mir steers the patients to one of approximately 18 diagnostic imaging facilities located across Southern California that OneSource, [Safvi Medical], or Expert holds out as [their] own but which, in reality, are independent diagnostic radiology facilities with which Mir, through OneSource, contracts to perform the technical component of MRI[s] for roughly $150 per scan.  For example, the address for 'Expert Beverly Hills' is actually the location of a business known as 'Dynamic Upright MRI,' and 'Expert MRI Bakersfield' is actually a business known as 'Bakersfield Upright MRI.'  One facility located in Bellflower, California, which Expert holds out as its own, is actually owned by Mir, via OneSource, with Mir contracting with Expert to allow the use of the facility on a non-exclusive basis.  After the MRI is performed by the diagnostic radiology facility, Mir uses his contracted radiologists, including Safvi and Mazhar, to interpret the images and prepare reports of their findings on Expert and [Safvi Medical] letterhead, for roughly $25 per region of the body scanned."

"With zero oversight, control or review by the contracted providers, Mir, through OneSource, prepares and provides to the attorneys who referred patients to him false, fraudulent, or

8

misleading billing statements containing grossly inflated 'global' [fn. omitted] fees for the MRI services on OneSource, Expert or [Safvi Medical] letterhead, with the intent that they be used in support of bodily injury and other claims. In addition to making it appear as though the company on whose letterhead the bill and/or report are documented rendered the service, Mir knowingly conceals the true costs of the services rendered and charges roughly *ten times* the amounts actually incurred by Mir as the broker of the services, *usually pricing a single study at approximately $1,750.* Mir's $1,500+ mark-up of the charges is not intended by Mir or the co-conspirator Defendant physicians to cover the cost of so-called 'administrative' or 'management' services, if any, provided by OneSource to Expert and/or [Safvi Medical]. To the contrary, the mark-up serves two purposes: to ensure Mir makes an enormous profit for doing nothing more than acting as 'middleman', brokering MRIs and referring patients to providers, and to fraudulently increase the value of the claim for personal injury made on behalf of claimants by the referring attorneys . . . ."

As in the Discovery action, Allstate attached to the complaint in the OneSource action a spreadsheet that identified 2,300 allegedly false claims presented to Allstate by treatment date, claim number, provider name, name of MRI facility, amount billed, and the name of the attorney who submitted the claim.

## III.  The demurrers to the amended complaints.

Defendants demurred to the amended complaints. Collectively, they asserted that (1) the amended complaints lacked the specificity required to plead fraud claims, (2) allegations that defendants are engaged in the unlawful practice of medicine cannot form the basis for IFPA or UCL

9

claims, and (3) the claims in the Discovery action were time-barred.

Allstate opposed the demurrers. It asserted that the MRI brokering scheme alleged in the amended complaints resulted in false claims actionable under the IFPA and the UCL, the causes of action were pled with sufficient particularity, and the Discovery action was not time-barred.

The trial court sustained the demurrers without leave to amend. It found, first, that Allstate did not comply with the court's prior order because it did not identify the dates of each allegedly false bill, the persons or entities who prepared the bills, the persons or entities who transmitted the bills to Allstate, or which defendants made each alleged false statement. Second, the court found the complaints "woefully lacking in the required specificity": "While the body of the FAC makes a number of inflammatory and conclusory assertions, largely based on 'information and belief,' the gravamen is that 'defendants' presented . . . inflated claims which Allstate paid. But when specifically ordered to provide the details of these false claims, Allstate had not done so." Third, the court said, it was insufficient for Allstate to "invoke the mantra of 'structural fraud.' Importantly, Allstate makes *no* claim here that: (1) MRIs were not administered; (2) MRIs were not medically necessary; or (3) qualified radiologists did not read the MRIs. . . . [¶] . . . [Instead, Allstate argues] that this case involves the unlawful corporate practice of medicine and that 'Mir engaged in the unlawful practice of medicine.' But what the oppositions focus on, and the [complaints] allege, is that Mir handled the *non-medical elements* for the radiology [practices], e.g., he picked the sites and the MRI machines, selected the radiologists and

10

handled the finances, including billing and collection.  This structure is not unlawful."  Fourth, the court said the Discovery action was untimely.  Finally, the court concluded that leave to amend was not warranted.

The trial court entered judgments of dismissal in the Discovery and OneSource actions on August 16, 2021.  Allstate timely appealed.

## DISCUSSION

This appeal presents four basic issues:  (1) Are the business models alleged in the amended complaints unlawful?  (2) If the alleged business models are unlawful, do they give rise to causes of action under the IFPA and the UCL?  (3) Do the amended complaints plead fraud with sufficient particularity?  (4) Does the Discovery action adequately allege delayed discovery to survive demurrer on statute of limitations grounds?

As we discuss more fully below, the answer to each of these questions is "yes."  First, the operative complaints allege the unlicensed practice of medicine in violation of the Medical Practice Act (§ 2000 et seq.) and related statutes.  Second, claims submitted to an insurer for medical services rendered in violation of the Medical Practice Act may give rise to causes of action under the IFPA and the UCL.  Third, Allstate's claims are pled with adequate specificity.  Finally, as alleged, the claims asserted in the Discovery action are not time-barred as a matter of law.

## I.     Standard of review.

" 'On appeal from an order of dismissal after an order sustaining a demurrer, the standard of review is de novo: we exercise our independent judgment about whether the complaint states a cause of action as a matter of law.  [Citation.]  First, we

11

give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. Next, we treat the demurrer as admitting all material facts properly pleaded. Then we determine whether the complaint states facts sufficient to constitute a cause of action. [Citations.] [¶] We do not, however, assume the truth of contentions, deductions, or conclusions of law. [Citation.]' (*Stearn v. County of San Bernardino* (2009) 170 Cal.App.4th 434, 439–440.)

"When a demurrer is sustained without leave to amend, ' " 'we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff.' [Citation.]" ' (*State of California ex rel. Bowen v. Bank of America* Corp. (2005) 126 Cal.App.4th 225, 239.)" (*State of California ex rel. McCann v. Bank of America, N.A.* (2011) 191 Cal.App.4th 897, 906 (*McCann*).)

## II. The operative complaints allege the unlicensed practice of medicine in violation of the Medical Practice Act.

Defendants asserted below, and the trial court concluded, that the business practices alleged in the complaints were lawful because Mir and OneSource allegedly provided only managerial and/or administrative services, not medical care, and thus did not engage in the unlicensed practice of medicine. For the reasons that follow, we disagree.

12

## A. The Medical Practice Act and the unlicensed-practice-of-medicine doctrine.

The Medical Practice Act (sometimes referred to as the Act) and related provisions regulate the practice of medicine in California. Among other things, the Medical Practice Act prohibits unlicensed persons from practicing, advertising, or holding themselves out as practicing "any system or mode of treating the sick or afflicted" or "diagnos[ing], treat[ing], operat[ing] for, or prescrib[ing] for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other physical or mental condition of any person." (§ 2052, subd. (a).) The Act also prohibits physicians from employing, aiding, or abetting any unlicensed person "to engage in the practice of medicine or any other mode of treating the sick or afflicted which requires a license to practice." (§ 2264; see also § 125 [physician who allows his or her license to be used by a non-physician, or who acts as the agent or partner of a non-physician with the intent to aid or assist the non-physician in the unlicensed practice of medicine, is guilty of a misdemeanor and subject to discipline].)[4]

### 1. Prohibition on lay ownership of medical corporations and partnerships.

Historically, the Medical Practice Act prohibited physicians from practicing through for-profit corporations or artificial legal entities of any kind. (See *Lathrop v. HealthCare Partners Medical Group* (2004) 114 Cal.App.4th 1412, 1420.) More

---

[4] Contrary to the assertions of Drs. Khan and Mazhar, a duly licensed physician may, under these sections, be liable for aiding and abetting the unlicensed practice of medicine.

13

recently, the Act has been amended to permit physicians to conduct their medical practices through medical corporations or partnerships so long as all the entities' shareholders or partners, as well as all employees rendering professional services, are themselves licensed. (*Id.* at pp. 1420–1421, citing §§ 2402, 2406, 2415, 2416; Corp. Code, §§ 13401, 13405.) However, the Act continues to prohibit what is sometimes referred to as the corporate practice of medicine (see, e.g., *Markow v. Rosner* (2016) 3 Cal.App.5th 1027, 1033)—that is, it "generally precludes for-profit corporations—*other than* licensed medical corporations—from providing medical care through either salaried employees or independent contractors." (*People v. Cole* (2006) 38 Cal.4th 964, 970–971, italics added; see also *Steinsmith v. Medical Board* (2000) 85 Cal.App.4th 458, 460 (*Steinsmith*) ["[m]edicine may be practiced in a partnership or group of physicians (§ 2416), but '[c]orporations and other artificial legal entities . . . have no professional rights, privileges, or powers' (§ 2400), and a 'fictitious-name' permit to operate a facility called a ' "medical clinic" ' can be issued only if the clinic is wholly owned by licensed physicians (§ 2415, subd. (b))"].)

Applying this principle, the Court of Appeal found a violation of the Medical Practice Act in *Steinsmith, supra,* 85 Cal.App.4th 458. There, the plaintiff was a licensed physician who performed disability evaluations as an independent contractor of a clinic owned in part by non-physicians. (*Id.* at p. 460.) The physician was cited by the Medical Board of California for aiding in the unlicensed practice of medicine, a finding that the Court of Appeal upheld. (*Id.* at pp. 460–464.) In so finding, the court rejected the physician's contention that the non-physician owners did not practice medicine because they

14

merely owned the clinic and administered its business affairs. The court explained: "A similar argument was rejected long ago in *Painless Parker v. Board of Dental Exam.* (1932) 216 Cal. 285. In that case, a licensed dentist was found to have aided and abetted the unlicensed practice of dentistry by a corporation he formed to own and operate dental offices. (*Id.* at pp. 289, 298.) The dentist argued, as Steinsmith does here, that the licensing requirements for the provision of professional services did not apply to 'the purely business side of the practice.' (*Id.* at p. 295.) Our Supreme Court rejected that argument . . . . [¶] . . . The unlicensed practitioner in *Painless Parker* was a corporation, but it has long been 'well settled' that 'any other unlicensed person or entity' is subject to the same sanctions for unlawful practice as an unlicensed corporation. [Citation.] Accordingly, the *Painless Parker* case disposes of Steinsmith's argument that there was no unlicensed practice he could have aided." (*Id.* at pp. 465–466.)

The Attorney General similarly opined in a 1982 opinion addressing whether an entity not licensed as a medical corporation could lawfully engage physicians to treat employment-related injuries sustained by employees of another corporate entity. (65 Ops.Cal.Atty.Gen. 223 (1982).) The Attorney General noted that, as general rule, a corporation "may neither engage in the practice of medicine directly, nor may it do so <u>indirectly</u> by 'engaging [physicians] to perform professional services for those with whom the corporation contracts to furnish such services.'" (*Id.* at p. 224.) This is so, the Attorney General explained, because "it has been said 'to be against public policy to permit a 'middleman' to intervene for profit in establishing the professional relationship between members of said profession and members of the public.' [Citation.] . . . [T]he reasons underlying

15

the proscription are two:  first, that the presence of a corporate entity is incongruous in the workings of a professional regulatory licensing scheme which is based on <u>personal</u> qualification, responsibility and sanction, and second, that the interposition of a lay commercial entity between the professional and his/her patients would give rise to divided loyalties on the part of the professional and would destroy the professional relationship into which it was cast." (*Ibid*.)  The Attorney General therefore concluded that the proposed arrangement was unlawful because the non-medical corporation at issue "is a lay commercial enterprise that is organized for profit which it expects to derive from creating and administering the professional relationship between physicians whom it engages and their patients who are employees of entities with whom it contracts to furnish medical services.  It actively solicits corporations to permit it to become the 'middleman' in establishing that professional relationship and to thereafter 'administer' it (e.g., billings, etc.).  The activity thus described, albeit a variation on the theme, clearly is of the type that has consistently been assailed as constituting the corporate practice of medicine." (*Id.* at pp. 228–229.)

### 2. Prohibition on non-physicians exercising undue control or discretion over a medical practice.

Although non-physicians may not own corporations that engage in the practice of medicine, they may manage some non-medical/business aspects of a physician's practice without violating the Medical Practice Act.  (*Epic Medical Management, LLC v. Paquette* (2015) 244 Cal.App.4th 504, 517–518 (*Epic*).)  Cases have noted, however, that "[i]n a professional corporation, it is not always possible to divide the 'business' side of the

16

corporation from the part which renders professional services" (*Marik v. Superior Court* (1987) 191 Cal.App.3d 1136, 1140), and a violation of the Act occurs if a non-physician exercises "control or discretion" over a medical practice (*Epic*, at p. 517; *People v. Superior Court* (*Cardillo*) (2013) 218 Cal.App.4th 492, 498 (*Cardillo*)).

The Court of Appeal considered the extent to which a non-physician may lawfully be involved in the running of a medical practice in *Epic*, *supra*, 244 Cal.App.4th 504. There, a management company contracted with a physician to lease him office space and medical equipment, provide non-physician personnel, and manage the physician's marketing, billing, collections, and accounting. In exchange, the physician agreed to pay the management company 50 percent of his professional revenues and 25 percent of his surgical revenues. (*Id.* at p. 508.) After the physician terminated the management contract, the management company sued to recover unpaid management fees. The management company prevailed before an arbitrator, and the trial court affirmed the award. (*Id.* at pp. 509–511.)

On appeal, the physician urged that the management contract was illegal because the management company engaged in the unlicensed practice of medicine. (*Epic*, *supra*, 244 Cal.App.4th at pp. 511, 517–518.) The Court of Appeal disagreed and affirmed. It explained: "Determining whether the contractual relationship between a physician and a non-licensee results in the non-licensee's unlicensed practice of medicine requires a legal interpretation of the substantive provisions of the agreement. (55 Ops.Cal.Atty.Gen. 103 (1972).) The issue turns on whether the non-licensee exercises or has retained the right to exercise *control or discretion* over the physician's practice.

17

[Citations.] Our review of the terms of the Management Services Agreement shows a strict delineation between the medical elements of the practice which the doctor controls, and the non-medical elements which the doctor has retained the management company to handle. The management company is not the doctor's employer nor his partner, and exercises no control over the doctor's practice." (*Id.* at pp. 517–518, italics added.)[5] Accordingly, the court said, there was no violation of the prohibition against the unlicensed practice of medicine. (*Id.* at p. 517.)

The court considered a similar issue in *Cardillo, supra,* 218 Cal.App.4th 492. There, two non-physician owners of a corporation that operated Kush Dr., a medical marijuana clinic, were charged with practicing medicine without a license. (*Id.* at p. 494.) They moved to dismiss the charges, urging that they had not engaged in the unlicensed practice of medicine because they did not treat patients, but instead provided only management services for the physicians who operated out of the clinic and wrote medical marijuana prescriptions. (*Id.* at pp. 495–496.)

The trial court dismissed the charges, but the Court of Appeal reinstated them, explaining that the evidence presented at the preliminary hearing indicated that the clinic's owners

---

[5] Mir's respondents' brief asserts that under *Epic*, arrangements between a physician and management company are lawful as long as laypersons do not " 'exercise control or discretion over . . . the medical elements of the practice.' " In fact, as quoted above, *Epic* holds that whether a non-physician has engaged in the unlicensed practice of medicine turns on "whether the non-licensee exercises or has retained the right to exercise control or discretion *over the physician's practice.*" (*Epic, supra,* 244 Cal.App.4th at p. 517, italics added.)

18

"controlled the operations of the clinics by employing licensed physicians to issue recommendations for medical marijuana, setting the physicians' hours, soliciting and scheduling patients, collecting fees from the patients, and paying the physicians a percentage of those fees.  In short, defendants set up a system or mode for treating the sick or afflicted in violation of section 2052. The fact that neither [non-physician] actually examined any patients or prescribed medical marijuana to them does not absolve them of criminal liability for practicing medicine without a license."  (*Id.* at p. 498.)

Synthesizing relevant legal authority, the California Medical Board[6] provides the following guidance for practitioners regarding the delegation of practice management to non-physicians:  "[T]he following 'business' or 'management' decisions and activities, resulting in control over the physician's practice of medicine, should be made by a licensed California physician and not by an unlicensed person or entity:  . . .

"●     Selection, hiring/firing (as it relates to clinical competency or proficiency) of physicians, allied health staff and medical assistants;

"●     Setting the parameters under which the physician will enter into contractual relationships with third-party payers;

"●     Decisions regarding coding and billing procedures for patient care services; and

"●     Approving of the selection of medical equipment and medical supplies for the medical practice." (<https://www.mbc.ca.gov/Licensing/Physicians-and-Surgeons/

---

[6]     The California Medical Board has a variety of responsibilities, including the enforcement of the disciplinary and criminal provisions of the Medical Practice Act.  (§ 2004.)

19

Practice-Information/> [as of Aug. 15, 2023], archived at <https://perma.cc/G9CT-BXT9>.)

According to the Medical Board, the above decisions and activities "cannot be delegated to an unlicensed person, including (for example) management service organizations. While a physician may consult with unlicensed persons in making the 'business' or 'management' decisions described above, the physician must retain the ultimate responsibility for, or approval of, those decisions." (<https://www.mbc.ca.gov/Licensing/Physicians-and-Surgeons/Practice-Information/> [as of Aug. 15, 2023].)

The Medical Board further states that a non-physician may not "own[] or operat[e] a business that offers patient evaluation, diagnosis, care and/or treatment," and a management service organization may not "arrang[e] for, advertis[e], or provid[e] medical services rather than only provid[e] administrative staff and services for a physician's medical practice (non-physician exercising controls over a physician's medical practice, even where physicians own and operate the business)." It explains: "In the examples above, non-physicians would be engaged in the unlicensed practice of medicine, and the physician may be aiding and abetting the unlicensed practice of medicine." (<https://www.mbc.ca.gov/Licensing/Physicians-and-Surgeons/Practice-Information/> [as of Aug. 15, 2023].)

### 3.     Radiology referrals as the unlicensed practice of medicine.

We are not aware of any appellate decisions that have discussed the unlicensed practice of medicine in the specific context of referrals for radiology services. However, the Attorney General has twice opined that selecting a radiology provider

involves the practice of medicine.[7]  In an opinion issued in 2000, the Attorney General stated that a management services organization may not, for a fee, select, schedule, secure, and pay for radiology diagnostic services ordered by a physician because that would constitute the unlicensed practice of medicine.  The opinion explained:  "[T]he selection of a radiology site with appropriate equipment and operational personnel best suited for the performance of a diagnostic radiology study of a patient's particular physical disorder, as well as the selection of a qualified radiologist to view and interpret the films, would involve the exercise of professional judgment and evaluation as part of the practice of medicine."  (83 Ops.Cal.Atty.Gen. 170 (2000).)[8]

Subsequently, in a 2009 opinion the Attorney General "reiterate[d] [its] view that professional radiology services—

---

[7]  " 'Opinions of the Attorney General, while not binding, are entitled to great weight.  [Citations.]  In the absence of controlling authority, these opinions are persuasive "since the Legislature is presumed to be cognizant of that construction of the statute," ' " and we presume the interpretation " 'has come to the attention of the Legislature, and if it were contrary to the legislative intent that some corrective measure would have been adopted . . . .' "  (*California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 17 (*Rank*); *Almond Alliance of California v. Fish & Game Com.* (2022) 79 Cal.App.5th 337 [quoting *Rank*].)

[8]  Discovery Radiology asserts that this opinion "may be relevant to Allstate's claims against OneSource, but it has no relevance to Discovery's operations."  We do not agree.  Both cases allege radiology referrals by a non-physician:  by Mir in the Discovery action, and by OneSource in the OneSource action.  The fact that the Discovery Radiology action does not allege the existence of a management company is not relevant to the analysis.

specifically including the selection of a suitable radiologist, and the selection of a suitable radiology facility with appropriate equipment and personnel, as well as preparing and interpreting radiological images—involve the exercise of professional judgment as part of the practice of medicine." (92 Ops.Cal.Atty.Gen. 56 (2009).)

### B.    Analysis.

The authorities discussed above make clear that a non-licensed individual need not examine a patient or render a medical diagnosis to engage in the unlicensed practice of medicine—to the contrary, a non-physician unlawfully practices medicine if he or she exercises undue control over a medical practice.  A non-physician undoubtedly exercises undue control by owning a medical practice, but may also exercise such control in a variety of other ways, including by choosing physicians to provide medical services, selecting medical equipment, determining the parameters of physicians' employment, including case load and compensation, and making billing decisions.

The amended complaints state claims against each defendant for engaging in or assisting in the unlicensed practice of medicine because they allege an unlawful degree of control by non-physicians over the medical corporations' provision of diagnostic radiology services.  The operative complaint in the Discovery Radiology action alleges that although Discovery Radiology was licensed as a professional medical corporation owned by Drs. Feske and Safvi, it actually was "owned, operated, or controlled" by Mir, who is not a physician and is not licensed to practice medicine.  Specifically, Mir is alleged to have "created [Discovery Radiology] as a professional medical corporation," filed documents on Discovery Radiology's behalf with the California

22

Secretary of State, the Medical Board of California, and the Center for Medicare and Medicaid Services, "recruited . . . patients from personal injury attorneys," "recruited physicians, including physician-Defendants Feske and Safvi, to appear on paper as the owners of [Discovery Radiology]," "entered into contracts with diagnostic radiology facilities to perform the technical component of the MRI scans (i.e., administer the MRIs) and with radiologists to perform the professional component of the MRI scan (i.e., interpret the MRI images)," selected the facilities and radiologists to whom patients would be referred, and prepared bills and reports for submission to insurance companies.  Further, Drs. Feske and Safvi, the purported owners of Discovery Radiology, are alleged to have "exercised no control, supervision or management of the corporation," but instead to have ceded control over referrals, billing, collections, and distribution of profits to Mir.

Similarly, the operative complaint in the OneSource action alleges that Mir created OneSource, 1st Source, Expert MRI, and Safvi Medical, and that although Expert MRI and Safvi Medical are licensed as professional medical corporations owned at various times by Drs. Mazhar, Kahn, and Safvi, they in fact are owned and controlled by Mir through OneSource.  Through OneSource, Mir allegedly markets the professional corporations to workers' compensation and personal injury attorneys, selects the diagnostic imaging facilities and radiologists to which patients are referred, and controls the professional corporations' billing, collections, and distribution of profits.  Further, Drs. Mazhar, Kahn, and Safvi are alleged to provide "zero oversight, control or review," having agreed to allow Mir to have "complete control over the selection of the diagnostic radiology

23

practices to which patients were sent; the selection of physicians who read and interpreted the MRI studies; the preparation of billing statements that [will] ultimately be presented to insurance companies, including determining the amount billed for the services rendered and billing codes used, if any; the collection of payment for the services from insurance companies; the banking of the insurance payments; and the distribution of profit[s]."

Defendants contend the complaints do not allege the unlicensed practice of medicine because they describe "nothing more than a permissible business model" in which a management services organization or layperson enters into contracts with professional corporations that "delegate[d] to the [management services organization] or layperson some level of control over the business management and administration of the [professional corporation] without ceding control or discretion over the physicians' practice of medicine." It is dispositive, defendants suggest, that "Mir and OneSource did not decide whether a patient needed MRI services, did not decide what MRI images needed to be taken, did not take the images, did not interpret the images, and did not form medical opinions based on those images. All of those tasks were performed by licensed professionals at their own discretion. Moreover, Allstate does not allege that the medical services rendered were excessive, not medically necessary, or inappropriate in any way, or that the billed-for services were not rendered."

It is true, as defendants assert, that the amended complaints do not allege that non-physicians ordered or interpreted the MRIs, or that the radiology services provided were excessive or not medically necessary. But that was equally

24

true in *Cardillo* and *Steinsmith*: In neither case was it alleged that non-physicians interfered with the physicians' practice of medicine by dictating diagnosis or treatment, or that the services provided were not medically necessary. Instead, the violation in those cases was a non-physician's partial ownership of the practice (*Steinsmith*) and control over the operations of the medical practice by, among other things, selecting the physicians who would perform medical services, setting the physician's hours, and soliciting and scheduling patients (*Cardillo*). A similar degree of control over the medical corporations by Mir is alleged in the present cases.

Contrary to defendants' contentions, therefore, the facts as alleged in the Discovery Radiology and OneSource actions are not "nearly identical" to those established in *Epic*. In *Epic*, although the management company had a significant role in managing the physician's practice, there was no suggestion there that the management company formed the physician's medical corporation, submitted required filings on his behalf to the Medical Board or Secretary of State, solicited patients, or determined to which physician those patients would be referred. Further, although the management company supplied the physician's medical equipment and support staff, the physician selected the medical equipment with which his office would be outfitted and trained and supervised the nursing staff. (*Epic*, *supra*, 244 Cal.App.4th at p. 508.) In short, while the management company's role was significant, the *physician*—not the management company—controlled the practice in a meaningful way. In the present case, in contrast, Mir and/or his management company, OneSource, are alleged to control the radiology practices: As noted above, Mir and/or OneSource are

25

alleged to have formed the medical corporations, filed licensing documents with federal and state authorities, contracted with MRI providers and radiologists, selected the MRI facilities to which patients would be directed, and determined which and how many patients would be referred to the contract radiologists. In short, Mir and OneSource are alleged to control the radiology practices at issue in this case to a far greater degree than was established in *Epic*.[9]

For all the foregoing reasons, we conclude that the operative complaints allege the unlicensed practice of medicine in violation of the Medical Practice Act. We therefore turn to the question of whether such allegations may give rise to claims under the IFPA and UCL.

## III.   The unlicensed practice of medicine may give rise to claims under the IFPA and UCL.

Defendants contend that even if the amended complaints allege the unlicensed practice of medicine in violation of the Medical Practice Act, those allegations do not give rise to causes of action under the IFPA or UCL. For the reasons that follow, we disagree.

### A.   The operative complaints state claims under the IFPA.

---

[9]   Discovery Radiology cites an additional case, *Blank v. Palo Alto-Stanford Hospital Center* (1965) 234 Cal.App.2d 377, 390, which it asserts holds that there is no unlicensed practice of medicine so long as physicians retain "freedom to practice." *Blank* concerned an alleged fee split between a medical group and a hospital for radiology services; it has no relevance to the present case.

### 1.    Overview of the IFPA.

The IFPA was enacted to prevent automobile and workers'
compensation insurance fraud in order to, among other things,
"significantly reduce the incidence of severity and automobile
insurance claim payments and . . . therefore produce a
commensurate reduction in automobile insurance premiums."
(Ins. Code, § 1871, subd. (c).)  To permit "the full utilization of the
expertise of the [insurance] commissioner and the department [of
insurance] so that they may more effectively investigate and
discover insurance frauds" (*id.*, § 1871, subd. (a)), the IFPA
contains a qui tam provision that allows any interested person to
bring an action for damages and penalties for fraudulent
insurance claims on behalf of the individual and the State of
California (*id.*, § 1871.7, subd. (e)(1)).  The person bringing the
qui tam action, referred to as the "relator," stands in the shoes of
the State of California, which is deemed to be the real party in
interest.  (*State ex rel. Aetna Health of California, Inc. v. Pain
Management Specialist Medical Group* (2020) 58 Cal.App.5th
1064, 1069–1070 (*Aetna*); *People ex rel. Strathmann v. Acacia
Research Corp.* (2012) 210 Cal.App.4th 487, 500 (*Strathmann*).)
The relator in an Insurance Code section 1871.7 qui tam action
does not personally recover damages, but if successful receives a
substantial percentage of the recovery as a bounty.  (§ 1871.7,
subd. (g); *Aetna*, at p. 1070; *Strathmann*, at p. 500.)

The complaints at issue here assert causes of action under
the IFPA, Insurance Code section 1871.7, subdivision (b).[10]  That

---

[10]    The complaints also allege violations of Insurance Code
section 1871.7, subdivision (a).  Because we conclude that the
complaints state claims under section 1871.7, subdivision (b), we
do not address subdivision (a).

27

section prescribes civil penalties for violations of Penal Code sections 549, 550, or 551, which target insurance fraud.  As relevant here, Penal Code section 550 prohibits knowingly preparing, presenting, or causing to be presented (1) "any false or fraudulent claim for the payment of a loss or injury, including payment of a loss or injury under a contract of insurance," or (2) "any writing, with the intent to . . . allow it to be presented . . . in support of any false or fraudulent claim."  (Pen. Code, § 550, subd. (a)(1), (5).)

A claim need not contain an express misstatement of fact to be actionable under Penal Code section 550 and Insurance Code section 1871.7, subdivision (b).  (*State ex rel. Wilson v. Superior Court* (2014) 227 Cal.App.4th 579, 601 (*Wilson*); *People ex rel. Allstate Ins. Co. v. Suh* (2019) 37 Cal.App.5th 253, 260 (*Suh*).)  Instead, these sections require only that a person knowingly, and with intent to defraud, "(1) present a claim that is false or fraudulent in some respect, (2) present, prepare, or make a statement containing false or misleading information about a material fact, or (3) conceal an event that affects a person's right or entitlement to insurance benefits."  (*Suh*, at p. 260.)  In other words, "[a]n insurance claim is fraudulent under [Penal Code] section 550 and [Insurance Code] section 1871.7, subdivision (b), when it is 'characterized in any way by deceit' " (*ibid*.) or "result[s] from deceit or conduct that is done with an intention to gain unfair or dishonest advantage."  (*Wilson*, at p. 602.)

28

### 2. The unlicensed practice of medicine as the basis for an IFPA claim.

Defendants urge that as a matter of law, the unlicensed practice of medicine cannot form the basis for an IFPA claim because "[t]he IFPA by its terms does not prohibit the [unlicensed practice of medicine] . . . [n]or does it incorporate Business and Professions Code § 2400, which 'embodies [California's] ban on the corporate practice of medicine' . . . [or] any of the other provisions of the Medical Practice Act . . . that govern the unlicensed practice of medicine." Further, defendants suggest, because the IFPA "enumerates specific prohibited acts and incorporates those prohibited acts listed in California Penal Code §§ 549–551," it presumably "intended for that list to be exclusive."

We do not agree. Penal Code sections 549 to 551 criminalize the submission of false or fraudulent insurance claims, but do not detail the circumstances that will render particular claims "false" or "fraudulent." Accordingly, courts have held, the "clear import" of these sections "is to criminalize the making of false or fraudulent claims the ultimate objective of which is to obtain benefits to which the offender is not entitled." (*People v. Blick* (2007) 153 Cal.App.4th 759, 772–773.)

Moreover, as Allstate notes, prior appellate decisions have held that the unlicensed practice of medicine *can* form the basis for an IFPA claim. The court considered this issue in *People ex rel. Monterey Mushrooms, Inc. v. Thompson* (2006) 136 Cal.App.4th 24 (*Monterey Mushrooms*), one of two cases addressing the unlicensed practice of medicine by chiropractors Steven Thompson and Aster Kifle-Thompson (the Thompsons). In brief, those cases concerned the Thompsons's creation of

29

medical corporations to provide both chiropractic and medical services, as well as a management company to provide nonprofessional employees, payroll services, and management services to the medical corporations. Because state law required the medical corporations to be owned by a licensed physician, the Thompsons arranged for an out-of-state physician to be the absentee owner, and hired a licensed physician to work part-time at the medical corporations' clinics. (*Kifle-Thompson v. State Bd. of Chiropractic Examiners* (2012) 208 Cal.App.4th 518, 521, 524–526 (*Kifle-Thompson*).)[11]

A self-insured employer sued the Thompsons for insurance fraud, asserting that they and their medical and management corporations had violated the IFPA by submitting false claims for workers' compensation payments. (*Monterey Mushrooms, supra*, 136 Cal.App.4th at p. 27.) The case was tried to the court, which found the Thompsons and the corporations liable for "having 'set up sham corporations, with medical doctors as ostensible owners, that presented to the public as full-service medical clinics. In reality, the medical doctors were essentially a series of absentee figureheads who gave no consideration for their ownership interests and, for the most part, had no meaningful role in the direction of patient care or general clinic operation.' The purpose of these corporations was to allow these defendants to 'acquire patients and refer them for chiropractic treatment and to present fraudulent claims for services to third-party payors.' The result was that patients were 'inevitably being directed to chiropractic "treatment," where they were grossly over[-]treated. Bills were generated for these patient visits, and in some cases more than

---

[11] *Kifle-Thompson* was a related appeal from the revocation of Kifle-Thompson's chiropractic license.

30

one claim was made for a single session.' " (*Id.* at p. 28, italics omitted.)  The trial court found that the insurance claims submitted by the Thompsons and their corporations thus violated the IFPA, and it awarded the plaintiff more than $1 million in civil penalties and attorney fees.  (*Ibid.*)

The Thompsons appealed, contending, among other things, that Kifle-Thompson and one of her medical corporations, IFMG, should have been dismissed because they were not alleged to have treated any of the patients identified in the complaint.  The Court of Appeal disagreed and affirmed.  It explained that the case "was not merely about the submission of false or excessive treatment claims regarding specific employees; it embraced an entire scheme in which Kifle-Thompson, on her own and through IFMG, helped defraud [the employer], the workers' compensation system, and the public.  The trial testimony and documentary evidence convinced the trial court as fact finder that Kifle-Thompson and her husband had set up illegal corporate medical practices, 'affecting not just a single patient or employer or even solely patients with industrial injuries.'  They gave physicians ostensible ownership of these corporations while retaining full control over the structure, finances, and operation of each corporation, including patient care. . . . [¶] . . . Kifle-Thompson was an active part of the conspiracy enabling them to achieve these objectives through [the medical corporations] [and] . . . their 'management service' or 'shell' corporation." (*Monterey Mushrooms*, *supra*, 136 Cal.App.4th at pp. 36–37.)  Thus, the Court of Appeal said, the trial court properly found Kifle-Thompson and IFMG liable for violations of Insurance Code section 1871.7.  (*Monterey Mushrooms*, at pp. 39–40.)

31

The Court of Appeal reached a similar conclusion in a related context in *Suh, supra*, 37 Cal.App.5th 253, an IFPA case involving the unlicensed practice of law.  There, evidence introduced at trial demonstrated that defendants, who were not attorneys, set up eight sham law firms, paid several attorneys a monthly fee to use their names and state bar numbers, and filed insurance claims on behalf of Allstate's insureds.  At trial, Allstate did not contend that the insurance claims submitted by defendants contained false or fraudulent statements about the insureds, but rather that obtaining insurance proceeds by posing as law firms was actionable under the IFPA.  (*Id.* at pp. 255–256.)  The jury found for Allstate, and defendants appealed.

On appeal, the defendants urged that as a matter of law, they did not violate Penal Code section 550 or submit fraudulent claims within the meaning of Insurance Code section 1871.7, subdivision (b) because although the insureds were not actually represented by attorneys, the information in the claim forms was accurate—i.e., " '[t]here was no allegation of staged accidents, nor any claim that injuries were inflated or that treatment was not provided.' " (*Suh, supra*, 37 Cal.App.5th at pp. 255, 259.)  The Court of Appeal disagreed, concluding that the defendants "read the insurance fraud statutes too narrowly." (*Id.* at p. 260.)  It explained:  "[Defendants] perpetrated a deceitful insurance scheme designed to acquire insurance proceeds illegally for personal gain.  [Defendants] deceived Allstate into believing the attorneys whose names they were using actually and lawfully represented its insureds.  (See Cal. Code Regs., tit. 10, § 2695.2(c) [only attorneys, family members, adjusters, or other persons authorized by law may represent insureds].)  In their communications with Allstate, [defendants] misrepresented that

attorneys represented the insureds. They concealed the fact they were masquerading as attorneys when they filed the insurance claims. And the misrepresentations were material: Allstate would not have released settlement proceeds to [defendants] or their sham law firms had Allstate known the truth. The conduct of [defendants] constituted insurance fraud under [Penal Code] section 550 and [Insurance Code] section 1871.7." (*Id.* at p. 260.)

### 3. Analysis.

Plainly, both *Monterey Mushrooms* and *Suh* support the proposition that the unlicensed practice of medicine (or law) can give rise to IFPA claims. Defendants nonetheless contend that because of factual differences between the present case, on the one hand, and *Monterey Mushrooms* and *Suh*, on the other, those cases are irrelevant here. We do not agree.

Defendants contend that *Monterey Mushrooms* is fundamentally different from the present cases because there the physicians who acted as the professional corporations' medical directors " 'had no meaningful role in the direction of patient care or general clinic operation,' " and patients were alleged to have been " 'grossly over-treated.' " In the present cases, defendants assert, "[n]o remotely similar facts have been alleged."

Defendants undoubtedly are correct that *Monterey Mushrooms* concerned some facts not alleged in the present cases—namely, that patients were over-treated and, in some cases, multiple bills were submitted for the same sessions. (*Monterey Mushrooms, supra*, 136 Cal.App.4th at p. 28.) The *Monterey Mushrooms* court made clear, however, that the case "was not merely about the submission of false or excessive treatment claims regarding specific [patients]," but also "embraced an entire scheme" in which the non-physician

33

defendants set up corporate medical practices that were ostensibly controlled by physicians, but over which the non-physician defendants had "full control" of the "structure, finances, and operation." (*Id.* at p. 36.)  In other words, *Monterey Mushrooms* stands for the proposition that claims submitted by a corporation engaging in the unlicensed practice of medicine may, without more, give rise to IFPA claims, a conclusion of obvious relevance to the present case.

Defendants also contend that *Suh* is distinguishable because in that case, the defendant " 'masquerad[ed]' " as an attorney, "procured clients she was not 'authorized to represent,' and submitted insurance claims on behalf of those clients without the consent of actual attorneys."  Unquestionably, there are factual differences between *Suh* and the present cases.  *Suh* nonetheless is relevant because there was no allegation in that case that accidents were staged, injuries were inflated, or treatment was not provided.  (*Suh*, *supra*, 37 Cal.App.5th at p. 259.)  In other words, the insurer neither alleged nor proved that the policyholders were not entitled to recover under their automobile insurance policies in the amounts of the claims they submitted.  Instead, the sole basis for the IFPA claim was the organizational structure of the purported law firms that submitted the claims on behalf of the policyholders—that is, that the firms were controlled by laypersons, not by attorneys.  Allstate's allegations in the present cases are similar:  It alleges that the claims submitted to it for services allegedly rendered by the defendants are fraudulent because the entities that submitted them are not what they purport to be—that is, although the entities hold themselves out as professional corporations, they actually are controlled by a layperson or

34

management company.  *Suh* thus supports the proposition that an allegation of this kind can support a claim under the IFPA.

Defendants contend that *Ebeid ex rel. United States v. Lungwitz* (9th Cir. 2010) 616 F.3d 993 (*Ebeid*) holds that an unlicensed practice of medicine claim cannot serve as predicate to a federal False Claims Act case, which defendants urge is persuasive here.  Not so.  *Ebeid* concerned an allegation that claims submitted by the defendant for Medicare reimbursement were fraudulent because the defendants engaged in the unlawful corporate practice of medicine.  (*Id.* at p. 995.)  The Ninth Circuit affirmed the district court's dismissal of the complaint for failure to allege fraud with sufficient particularity.  (*Id.* at p. 1001.)  It noted that under the federal False Claims Act, a plaintiff must establish that an alleged false statement was material to the government's decision to make a payment to the claimant.  (*Id.* at p. 997.)  In the case before it, however, the plaintiff did not "refer to any statute, rule, regulation, or contract that condition[ed] payment on compliance with state law governing the corporate practice of medicine"; instead, plaintiff "baldly assert[ed] that had [claimant] 'not concealed or failed to disclose information affecting the right to payment, the United States would not have paid the claims.' " (*Id.* at pp. 999–1000.)  The Ninth Circuit concluded that this conclusory allegation was insufficient under Rule 9(b) of the Federal Rules of Civil Procedure.  (*Ebeid*, at p. 1000.)

*Ebeid* is not relevant to our analysis of the present case.  It does not hold that the unlicensed practice of medicine could *never* support a claim under the False Claims Act, but only that the operative complaint had not pled such a claim with the requisite specificity.  (*Ebeid*, *supra*, 616 F.3d at p. 1000.)  Moreover,

because *Ebeid* alleged fraudulent Medicare claims, the claimant's right to reimbursement necessarily was governed by federal Medicare laws and regulations. In contrast, the present case alleges false claims under the IFPA, and thus defendants' rights to reimbursement are governed by private contracts of insurance and state law, not federal law. The plaintiff's failure to state a claim in *Ebeid*, therefore, is irrelevant to the demurrers in the present case.

Defendants also urge that *California Physicians' Service v. Aoki Diabetes Research Institute* (2008) 163 Cal.App.4th 1506 (*Aoki*) holds that an insurance company may not use an unlicensed practice of medicine claim "as an excuse not to pay for services rendered to its insureds." *Aoki* is inapposite. The issue in that breach of contract action was whether a medical provider's organization as a nonprofit corporation, rather than a professional medical corporation, rendered its provider contract with a medical insurer unenforceable so that the provider could not recover under the contract. (*Id.* at pp. 1513, 1516–1517.) The Court of Appeal held the provider contract was enforceable because "a contract for the provision of medical services by licensed professionals is plainly not malum in se." (*Id.* at p. 1517.) The present case, in contrast, does not arise out of a contract between an insurer and a provider; it is instead a fraud action brought in the name of, and on behalf of, the state of California. Nor does Allstate seek to "avoid paying for" services rendered under an insurance contract, as defendants suggest; Allstate has already paid for those services, and seeks through this action to recover a statutory penalty that, if recovered, will be shared by the state. (Ins. Code, § 1871.7, subd. (g)(2)(A).)

36

For all of these reasons, we conclude that the complaints allege claims under the IFPA.

## B. The operative complaints state claims under the UCL.

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." (§ 17200.) " 'By proscribing "any unlawful" business practice, "section 17200 'borrows' violations of other laws and treats them as unlawful practices" that the unfair competition law makes independently actionable.' (*Cel-Tech* [*Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999)] 20 Cal.4th [163,] 180.) 'To prevail on a claim under the unlawful prong of the unfair competition law, the plaintiff must show that a challenged advertisement or practice violates any federal or California "statute or regulation." ' " (*Beasley v. Tootsie Roll Industries, Inc.* (2022) 85 Cal.App.5th 901, 911–912.)

All parties agree that Allstate's UCL claims are derivative of its IFPA claims, and thus that the UCL claims rise or fall with the IFPA claims. Because the complaints adequately plead violations of the IFPA, they also adequately plead violations of the UCL.

## IV. The amended complaints were pled with adequate specificity.

Defendants urged in their demurrers, and the trial court concluded, that the complaints did not plead the IFPA claims with adequate specificity. For the reasons that follow, we disagree.

As in any action sounding in fraud, an IFPA action must be pleaded with particularity. "In California, fraud must be pled

specifically; general and conclusory allegations do not suffice. [Citations.] . . . 'This particularity requirement necessitates pleading *facts* which "show how, when, where, to whom, and by what means the representations were tendered." ' " (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645.)

" 'The specificity requirement serves two purposes.  The first is notice to the defendant, to "furnish the defendant with certain definite charges which can be intelligently met." [Citations.]  The pleading of fraud, however, is also the last remaining habitat of the common law notion that a complaint should be sufficiently specific that the court can weed out nonmeritorious actions on the basis of the pleadings.  Thus, the pleading should be sufficient " 'to enable the court to determine whether, on the facts pleaded, there is any foundation, prima facie at least, for the charge of fraud.' " ' (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 216–217.)" (*JPMorgan Chase Bank, N.A. v. Superior Court* (2022) 85 Cal.App.5th 477, 494.)

We conclude that both amended complaints are pled with adequate specificity.  The amended complaint in the Discovery action identifies the role each defendant allegedly played in the fraudulent scheme.  Specifically, it alleges that Mir "owned, operated, or controlled" Discovery Radiology, entered into contracts with diagnostic radiology facilities to perform MRI scans and with radiologists to interpret MRI images, recruited patients from personal injury attorneys, selected the radiology facilities and radiologists to which patients were sent, and provided bills and reports on Discovery Radiology letterhead to attorneys, with knowledge that the attorneys would present the bills and reports to Allstate in support of insurance claims.  The

38

amended complaint further alleges that Drs. Feske and Safvi agreed to "appear on paper as the owners of" Discovery Radiology, but "exercised no significant control over" its operation and "surrender[ed] control of billing, collection, banking and the distribution of profits" to Mir, knowing that Mir intended to bill the insurer for the services. Finally, the attachment to the amended complaint identifies each allegedly false insurance claim by claim number, and additionally provides, for each claim, the date of treatment, the provider name that appeared on the claim, the amount billed, and the name of the attorney who submitted the claim.

Similarly, the amended complaint in the OneSource action alleges that Mir owns, operates, and controls OneSource, Expert MRI, and Safvi Medical, entered into contracts with radiology facilities and radiologists to provide services at fixed fees, markets radiology services to workers' compensation and personal injury attorneys, steers patients to radiologists and diagnostic radiology providers with which he has contracted, and prepares bills for the services provided without any supervision by a licensed radiologist. The complaint further alleges that Mir and OneSource "entered into contracts with the Defendant radiologists or their purported professional corporations, including [Safvi Medical] and [Expert MRI], to read and interpret MRI studies and to prepare written reports of their findings and diagnoses, to falsely appear on paper as owners and operators of professional medical corporations utilizing OneSource, and to grant absolute control to Mir and OneSource"; that Drs. Safvi, Mazhar, and Khan agreed to read MRIs, x-rays, and scans at negotiated rates and to allow Mir complete control over billing; that the physicians billed Mir and OneSource directly through

39

monthly billing statements that were submitted only to Mir and OneSource; that Safvi Medical entered into a written contract to allow Mir and his company to "have the sole and exclusive right to direct and oversee bill[ing] and collections . . . [and to] bill and collect on a global basis, under [Safvi Medical's] provider number," and agreed that it would have "no claims . . . for any compensation or other amounts from third-party payors"; that Dr. Mazhar allowed Mir to use his name and license number to register Expert MRI with the California Secretary of State and the California Medical Board, but never was a true owner of Expert MRI; that Dr. Khan agreed to replace Dr. Mazhar as the purported owner of Expert MRI, but never exercised any operational control over the business; and that Dr. Khan "in entering into the agreement to falsely appear as the owner of [Expert MRI], [knew] that the fraudulent scheme involved the preparation and presentation of false, fraudulent, and/or misleading billing statements to insurance companies." Finally, the attachment to the complaint identifies each allegedly false insurance claim by claim number, and additionally provides the date of treatment, the provider name that appeared on the claim, the amount billed, and the name of the attorney who submitted the claim.

Defendants contend that the complaints were not pled with adequate specificity because the attached spreadsheets did not allege " 'the dates . . . of each alleged false bill,' 'the person or entity who prepared the bill,' [or] 'the person or entity transmitting the billing statement to' Allstate.' " But defendants cite no authority for the proposition that these particular details are necessary to meet the pleading requirements. Moreover, even if these details were required, they were substantially

40

provided.  The bills were submitted on behalf of the providers, whose names are identified, and through attorneys, whose names are also identified.  And although the complaints do not specifically identify the dates the claims were submitted to Allstate, they did state for each claim the dates of treatment and the claim numbers, from which the allegedly false claims may be readily identified.  Defendants cite no authority to suggest that more is required.

Defendants also suggest that the complaints are inadequate because they do not allege "what [the claims] said that was false."  Not so.  As we have described, the complaints allege, among other things, that the claims were deceitful because the defendant medical corporations on whose behalf the claims were submitted were controlled by a non-physician, and because the claims falsely represented that the MRIs were performed and read by the defendant medical corporations, rather than by third parties with whom the medical corporations contracted.

Defendants further suggest that this case is analogous to *McCann*, *supra*, 191 Cal.App.4th at p. 908, a California False Claim Act case in which the relators alleged that the defendant bank defrauded the state by failing to pay over to it unidentified credits subject to escheat as unclaimed property.  (*Id.* at p. 902.) The Court of Appeal concluded that the relators had not pled their claims with sufficient particularity because while they identified an allegedly fraudulent practice (the failure to investigate unidentified credits and to then credit them to presenting banks), they did not identify any particular property that should have escheated.  In other words, they failed "to directly identify an amount or account—a liquidated and certain

41

obligation—due to any specified presenting bank (in California or elsewhere) that would be subject to escheat under the [unclaimed property law]." (*Id.* at p. 910.) The present case is distinguishable because Allstate has pled not only an allegedly fraudulent practice, but also identified each of the allegedly false claims submitted as a result of that practice.

For the foregoing reasons, we conclude that the complaints are pled with adequate specificity.

## V. Allstate's claims against Discovery Radiology cannot be resolved on demurrer.

An action under the IFPA "may not be filed more than three years after the discovery of the facts constituting the grounds for commencing the action." (Ins. Code, § 1871.7, subd. (*l*)(1).) The statute of limitations under this section is triggered by inquiry notice (*State of California ex rel. Metz v. CCC Information Services, Inc.* (2007) 149 Cal.App.4th 402, 415–417)—that is, the statute begins to run "once the plaintiff ' " 'has notice or information of circumstances to put a reasonable person *on inquiry. . . .*' " ' " (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110–1111).

It is undisputed that the Discovery action was filed more than three years after Discovery Radiology's bills were submitted to Allstate. The operative complaint alleges that the action nonetheless was timely filed because Allstate was not on inquiry notice of the claims until January 2018, when it "discovered that the facility address identified on the [Discovery Radiology] billing statements as the location of the service provided was a post office box at The UPS Store in Glendale, not an MRI facility, as represented by [Discovery Radiology]. Allstate then attempted to determine the physical location [of Discovery Radiology's] MRI

42

machines, . . . the identity of the person or entities that owned, operated or controlled [Discovery Radiology], the identity of [Discovery Radiology's] MRI technicians involved in the performance of scans, and where the [Discovery Radiology] records and actual diagnostic studies were stored.  In June 2019, Allstate also discovered that [Discovery Radiology's] La Palma, California address, which it had represented to the California Secretary of State as its corporate address on multiple occasions, was a shared Regus office suite and answering service, not an MRI facility or medical practice.  Allstate identified all open and closed files involving bills and reports from [Discovery Radiology] that were presented in support of or in connection with claims, finding that the service location listed on such documents was the Glendale address, that the reports appeared to be templated, that there were multiple MRI scans performed on patients, and that the actual location where the MRI scan was performed was not identified on the bills or reports."

Defendants contend that these allegations do not save the Discovery action because Allstate "necessarily had possession of the so-called 'templated' bills long before 2018.  Indeed, Allstate alleges that it began receiving the allegedly fraudulent bills as early as November 2015."  Additionally, because each bill included the Glendale address, "from the date that the first bill was submitted—and well into 2015, 2016, and 2017—Allstate would have been in possession of facts necessary to bring these claims."

When a plaintiff reasonably should have discovered facts for purposes of the accrual of a cause of action or application of the delayed discovery rule is generally a question of fact, properly decided as a matter of law only if the evidence (or, in the case of a

43

demurrer, the allegations in the complaint and facts properly subject to judicial notice) can support only one reasonable conclusion. (*Stella v. Asset Management Consultants, Inc.* (2017) 8 Cal.App.5th 181, 193; *Jolly v. Eli Lilly & Co.*, *supra*, 44 Cal.3d at p. 1112.) Similarly, " ' "[w]hether reliance [on a misrepresentation] was reasonable is a question of fact for the jury, and may be decided as a matter of law only if the facts permit reasonable minds to come to just one conclusion." ' (*Grisham v. Philip Morris U.S.A., Inc.* [(2007)] 40 Cal.4th [623,] 638; accord, *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239 [' "Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact." '].)" (*Broberg v. The Guardian Life Ins. Co. of America* (2009) 171 Cal.App.4th 912, 921.) " 'Whether a party has notice of "circumstances sufficient to put a prudent man upon inquiry as to a particular fact," and whether "by prosecuting such inquiry, he might have learned such fact" [citation], are themselves questions of fact to be determined by the jury or the trial court.' (*Northwestern P. C. Co. v. Atlantic P. C. Co.* (1917) 174 Cal. 308, 312; accord, *Hobart v. Hobart Estate Co.* (1945) 26 Cal.2d 412, 440.)" (*Vasquez v. LBS Financial Credit Union* (2020) 52 Cal.App.5th 97, 109.)

Contrary to the trial court, we do not believe that the timeliness of the Discovery action can be decided on demurrer. This is not a case where the allegations of the complaint can support only one reasonable conclusion: The claims submitted to Allstate by Discovery Radiology are not alleged to have contained any obviously false or fraudulent information, and we cannot say that the only reasonable inference to be drawn from the facts

44

alleged in the operative complaint in the Discovery action is that Allstate should have discovered the alleged unlicensed practice of medicine by Mir and Discovery Radiology prior to November 2017.  (See, e.g., *Alexander v. Exxon Mobil* (2013) 219 Cal.App.4th 1236, 1255–1256 ["We agree with appellants that the allegations set forth in the complaint . . . do not lead to a single 'reasonable conclusion' as to whether" notices advising the plaintiffs of environmental contamination should have caused them to suspect that such contamination posed a risk to their health]; *Broberg v. The Guardian Life Ins. Co. of America, supra*, 171 Cal.App.4th at p. 922 [alleged unreasonableness of insured's reliance on insurer's alleged misrepresentations was a fact issue not suitable for resolution on demurrer].)  Accordingly, at this juncture we cannot conclude that the Discovery action is time-barred as a matter of law.

**DISPOSITION**

The judgments of dismissal are reversed with directions to the trial court to vacate the orders sustaining the demurrers, enter new orders overruling the demurrers, and reinstate the amended complaints. Allstate shall recover its appellate costs.

**CERTIFIED FOR PUBLICATION**

EDMON, P. J.

We concur:

EGERTON, J.

HEIDEL, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.